35 S.W.3d 497 (2001)
In the Interests of T.E., J.E., J.F., S.F., and A.R.F.,
Department of Social Services, Division of Family Services, and Juvenile Officer, Respondents,
v.
J.F. (Father) and L.F. (Mother), Appellants.
No. ED 77163.
Missouri Court of Appeals, Eastern District, Division Four.
January 2, 2001.
*499 Julie Forman-Jones, Juvenile Officer, Union, MO, for Respondent.
Matthew Ambrose Schroeder, Union, MO, Michael Wade Clark, Washington, MO, for Appellants.
Jeanne Marr Kovas, Roya R. Hough, Jefferson City, MO, for Family Services.
SULLIVAN, Judge.
J.F. (Father) and L.F. (Mother) appeal from a trial court judgment terminating *500 their parental rights under Section 211.447[1] of their four children, T.E., J.E., J.F., and S.F. Father and Mother also appeal from a Finding of Jurisdiction by the trial court over a fifth child, A.R.F. We affirm in part and dismiss in part.
Mother has had fifteen pregnancies with six different men, leading to the births of thirteen children. Of the thirteen children born to Mother, two died from injuries suffered while in her legal custody. The remaining eleven children born to Mother have been removed by court order from her custody. Since the late 1970's, Mother has been involved with child protection agencies in several states.
Father and Mother considered themselves married in August 1988, but they were not legally married until 1995. T.E. was born in February 1989. J.E. was born in July 1990. J.F. was born in September 1991. S.F. was born in April 1994. A.R.F. was born in September 1999.
Father, Mother, T.E., J.E., and J.F. moved to Missouri in January 1992. In May 1992, the Missouri Department of Social Services, Division of Family Services ("DFS") received two hotline calls alleging abuse and neglect of T.E., J.E., and J.F. by Mother.[2] The first caller reported seeing T.E. and J.E., then ages three and twenty-two months respectively, running in the street unattended and seeing Mother hit the children with a board and pull their hair. The caller also indicated that there was excessive filth at the home. After the second call, the DFS workers visited neighbors and relatives and Father and Mother's home, where Mother threatened them during their visit. As a result of these investigations and learning of Mother's parental history, T.E., J.E., and J.F. were removed by court order from Mother's custody.[3]
While T.E., J.E., and J.F. were in protective custody, Father and Mother had another child, S.F., who was removed from their home when it was discovered that the home had no electricity or running water. While the children were in protective custody, Father and Mother cooperated with the DFS "to some extent but also with some hostility." Mother accepted parent aide services, and after Father was released from prison, they accepted counseling services. In July 1995, the four children were returned to the home.
In September 1995, the DFS received a report that the children were left unsupervised all day in the car at a Wal Mart.[4] The report was found to be "probable cause lack of supervision." However, the case was closed in January 1996.
In February 1996, the DFS received another report alleging that Father and Mother had not provided adequate supervision for the children. After an investigation, the allegations were found to be true, and physical neglect was also found, but the children remained with Father and Mother. The DFS provided preventative services to the family, including parent aide services, mental health classes for the children and the parents, parenting classes, and family therapy.
In the summer of 1996, the family moved out of their residence and began living in a tent and eventually in a 1969 mobile home without running water, sewage disposal, plumbing or electricity.[5] Trash covered the campsite and an abandoned refrigerator was within access of the *501 children. The DFS received a report that the children were unsupervised on busy streets and highways, where vehicles had to swerve to avoid hitting some of the children.[6] Other reports stated that the children had chronic hygiene problems and chronic head lice. The children had to walk barefoot through animal feces and urine to gain entry to the home. Also, the children had to walk approximately ¼ mile to the outhouse from their campsite without any supervision. The toilet was filled with feces within two inches from the top. Thousands of flies were present and a strong odor.
In October 1996, based on these conditions, T.E., J.E., J.F., and S.F. again were placed in protective custody by court order, and again the DFS provided services to the family. In January 1999, after a permanency review hearing, the trial court found that Father and Mother had not complied with the written terms of a Family Treatment Plan entered into with the DFS, that the DFS had made reasonable efforts, as described in Section 211.183, after removal of the children to make it possible for the children to return home, and that the DFS was not required to make further reasonable efforts for the children to return home.
In February 1999, the DFS filed a Petition for Termination of Parental Rights ("Petition") under Section 211.447. A hearing on the Petition was held for two days in June 1999 and for two days in August 1999. In its September 1999 judgment, the trial court concluded that, as to both Father and Mother, the DFS proved by clear, cogent and convincing evidence that grounds for termination of parental rights existed under Sections 211.447.2(1), 211.447.4(2), 211.447.4(3), and 211.447.4(6) and that termination was in the best interests of T.E., J.E., J.F., and S.F.
In September 1999, three days after her birth, A.R.F. was placed in protective custody by court order. In October 1999, the trial court entered a Finding of Jurisdiction over A.R.F. under Section 211.031.1(1) and affirmed, pending a disposition hearing, its previous order placing A.R.F. in protective custody.
Father and Mother filed separate appellate briefs. Thus, we will separately address each of their points on appeal. Father raises three points on appeal. In his first point, Father argues that the trial court erred in terminating the parental rights of Father and Mother because the DFS did not establish by clear, cogent and convincing evidence the basis for termination in that their home met the standard for adequate housing at the time of the Petition hearing and Father and Mother should not have had to defend their parental relationship with their children.
The trial court's judgment terminating parental rights will be affirmed unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. In the Interest of F.N.M., 951 S.W.2d 702, 703 (Mo.App. E.D.1997). The facts and reasonable inferences therefrom are viewed in the light most favorable to the trial court's judgment, and great deference is given to the trial court with respect to findings of fact and credibility of witnesses. Id. Before a court can terminate the rights of a parent, there must be clear, cogent and convincing evidence that one or more statutory grounds for termination set forth in Section 211.477 exist, and that such termination is in the best interest of the child. Id. at 705; Section 211.477.5. The parties seeking termination of parental rights bear the burden of proving their case by clear, cogent and convincing evidence, such that the finder of fact "is left with an abiding conviction that the evidence is true." In the Interest of F.N.M., 951 S.W.2d at 705. This standard of proof may be met even though the court has contrary evidence before it. Id.
*502 In support of his argument that Father and Mother's home met the standard for adequate housing at the time of the Petition hearing,[7] Father identifies the following evidence. Father testified that "electricity was granted" right after the Petition had been filed, the mobile home had running water, the sewer had been hooked up, and no debris was around the house and yard. Father stated that the home had been inspected and approved and that, at the time of the Petition hearing, "the mobile home [was] up and running and everything [was] working."
The trial court made the following relevant findings of fact as to Father:
16. Pursuant to Section 211.447.4(2), the children have been abused or neglected in that [Father] forced the children to live in an environment of extreme filth and squalor which did not come close to meeting minimal community standards in that they lived without clean water, sewer, electricity, refrigeration, or even enough beds to go around, resulting in poor hygiene and lice infestation.
17. Based on the competent evidence presented at trial, the Court considered the factors under Section 211.447.4(2) and finds the following facts have been proven by clear, cogent and convincing evidence:
....
d. [Father] has repeatedly and continuously failed to provide the children with adequate clothing, shelter, and education, and other care and control necessary for their physical, mental, or emotional health and development, although physically and financially able to do so, in that [Father] forced the children to live in an environment of extreme filth and squalor which did not come close to meeting minimal community standards in that they lived without clean water, sewer, electricity, refrigeration, or even enough beds to go around, resulting in poor hygiene and lice infestation.
1. Pursuant to Section 211.447.4(3), the children have been under the jurisdiction of the juvenile court for a period of more than one year and:
a. Conditions which led to the assumption of jurisdiction still persist in that [Father] will not provide a home for them which meets minimal standards; and
b. Conditions of potentially harmful nature continue to exist in that [Father's] current living arrangements are unknown...
....
2. Based on the competent evidence presented to the Court, the Court considered the factors under Section 211.447.4(3)(a) and finds that the following facts have been proven by clear, cogent and convincing evidence:
a. [Father] has failed to progress in complying with the terms of his social services plan.
b. The [DFS] has been unsuccessful in aiding [Father] in adjusting his circumstances or conduct to provide a proper home for the... children...
....
...
21. Based on the competent evidence presented at trial, the Court considered the factors under Section 211.447.6 and finds that the following facts have been proven by *503 clear, cogent and convincing evidence:
...
g. [Father] has deliberately subjected the... children to a substantial risk of physical or mental harm in that [Father] forced the children to live in an environment of extreme filth and squalor which did not come close to meeting minimal community standards in that they lived without clean water, sewer, electricity, refrigeration, or even enough beds to go around, resulting in poor hygiene and lice infestation.
The trial court made substantially similar findings of fact as to Mother.
Mother testified that the electricity was turned on at the mobile home in April 1999, but that at the time of her testimony,[8] they were "slightly behind" in the payment of the electric bill. Also, the heating system was a combination of electric space heaters and a kerosene heater. In the mobile home, paneling and at least one door needed replacing and a portion of the flooring needed to be repaired due to holes. The two-bedroom mobile home did not have beds for the children. Bathing usually occurred at a nearby truck stop or neighbor's house. Father did most of the housekeeping because Mother worked full-time, yet Father lived in Kansas from July 1999 to October 1999. Three dogs, five cats, and three "little birdies" were also present on their property. During Mother's testimony, a videotape, made on June 27, 1999 and showing the condition of the mobile home, was played for the trial court.
Other witnesses also testified to the housing conditions. A social worker for the DFS who visited the mobile home in November 1998 testified that there were several piles of metal debris and boards with nails sticking out on the property and opened cans of cat food with metal lids lying in the yard. Also, between March 1997 and November 1998, a therapeutic foster care worker for the DFS visited the mobile home several times, and she testified that windows and screens were missing and the stairs leading to the front door were shaky. The mobile home itself did not appear "real sturdy." During one visit, the worker noticed a meat cleaver or butcher's knife laying in the yard,[9] and on another visit, the worker noticed a gun laying on shelves against a wall just inside the mobile home.
Father also argues that Father and Mother should not have had "to defend their parental relationship with their children." In support of this argument, Father argues that the DFS kept "raising the bar" for reunification. For example, Father contends that although their living conditions in 1996 "may have been neglectful," at the time of the Petition hearing, Father had Social Security income and Mother had steady employment. However, the trial court found that "although physically and financially able to do so," Father and Mother were nonetheless unable to provide adequate housing for their children. Further, Father testified that he recognized a family treatment plan because "[n]othing ever changed on it." Additionally, a social worker for the DFS testified that the only information regarding compliance with a family treatment plan in 1999 that she had was that she drove by the mobile home and looking from the road, it appeared that there was electric in the residence.
Despite Father's claim of rectified home conditions at the time of the Petition hearing, this short-term improvement in circumstances that occurred after the filing of the Petition is not compelling. A parent's conduct after the filing of the *504 termination petition cannot constitute the sole consideration of the trial court's decision. In the Interest of T.T., 954 S.W.2d 429, 432 (Mo.App. W.D.1997). All grounds for termination must to some extent look to past conduct because the past provides vital clues to present and future conduct. Id. Otherwise, the parent may argue that he or she has reformed since the filing of the termination petition; reformation having occurred while the child was away. Id. Father and Mother had over two years to rectify their housing conditions, and they failed to do so.
Although Father may have presented evidence suggesting an improvement in housing conditions, the trial court found such evidence insufficient to countervail the evidence supporting termination. Presence of evidence in the record that might support another conclusion does not necessarily establish that the trial court's decision is against the weight of the evidence. In the Interest of J.M.L., 917 S.W.2d 193, 196 (Mo.App. W.D.1996). The facts set out above support the trial court's findings. We give great deference to the trial court with respect to findings of fact and credibility of witnesses. In the Interest of F.N.M., 951 S.W.2d at 703. Therefore, we find the trial court's judgment terminating the parental rights of Father and Mother under Section 211.477 of T.E., J.E., J.F., and S.F. is supported by substantial evidence and is not against the weight of the evidence. Accordingly, Father's point one on appeal is denied.
In his second point on appeal, Father argues that the trial court erred in not disqualifying itself for cause because it had previously adjudicated the permanency plan prior to the Petition hearing and because it had received ex parte communication from the DFS prior to the Petition hearing. Father argues that these actions violated his and Mother's constitutionally protected rights and prejudiced their defense of the Petition.
In his argument section for this point, Father suggests that Sections 211.183 and 211.444[10] are unconstitutional in violation of Father and Mother's right to a fair trial where the same judge presides over the permanency plan hearing and the petition for termination of parental rights hearing,[11] as occurred here. To preserve a constitutional question for appellate review, an appellant must (1) raise the constitutional question at the first available opportunity; (2) designate specifically the constitutional provision claimed to have been violated; (3) state the facts showing the violation; and (4) preserve the constitutional question throughout the proceedings. St. Louis County v. Kienzle, 844 S.W.2d 118, 122 (Mo.App. E.D.1992). Father did not raise the constitutional question presented in this point before the trial court. During the Petition hearing, Father raised the issue of the judge's bias having presided over the permanency plan hearing,[12] not how this arrangement might violate his and Mother's right to a fair trial. Thus, because Father did not raise the constitutional question at the first available opportunity, he has not preserved the constitutional question for appellate review.
Father also argues that the trial court's receipt of an ex parte communication from the DFS prejudiced his and Mother's defense of the Petition. The ex parte communication to which Father refers is a statutorily mandated, under Section 211.455(3), social summary entitled *505 History of Division of Family Services Involvement. Father argues that Section 211.455(3) unconstitutionally mandates ex parte communications between the DFS and the trial judge. For the same reasons as stated above, Father has not preserved this constitutional question for appellate review. Additionally, the trial court stated that it perceived no bias on its behalf and that it had no preconceived idea about the result of the Petition, and Father has not presented any evidence to the contrary. Accordingly, Father's point two on appeal is denied.
In his third point on appeal, Father argues that the trial court erred in finding jurisdiction over A.R.F. because its previous judgment terminating parental rights as to A.R.F.'s siblings was unlawful, and thus no statutory factors for termination of parental rights as to A.R.F. were present.
Respondents argue that the Finding of Jurisdiction entered by the trial court in October 1999 is not a final judgment for purposes of appeal. We agree. Rule 120.01a of the Supreme Court Rules of Practice and Procedure in Juvenile Court provides that an "appeal shall be allowed as provided by statute." Section 211.261.1 allows a parent to appeal "from any final judgment, order or decree made under the provisions of this chapter which adversely affects him." Further, Rule 119.06a provides that the "judgment shall include the disposition or treatment of the juvenile." In a recent case, the Western District of this Court held that dispositional orders of juvenile courts are appealable pursuant to Rule 120.01 and Section 211.261. In re C.A.D., 995 S.W.2d 21, 28 (Mo.App. W.D.1999); Cf. In re B. C., 991 S.W.2d 179, 181 (Mo.App. S.D.1999) (holding that a juvenile court's "Order of Disposition" was not a final judgment for purposes of appeal because it was not denominated a "judgment."). However, the Finding of Jurisdiction is not even an order of disposition. It is not denominated an "order," and it simply affirmed the trial court's previous order placing A.R.F. in protective custody pending a disposition hearing.[13] Accordingly, the Finding of Jurisdiction is not a final judgment for purposes of appeal, and we do not have jurisdiction to review Father's point three on appeal.
Mother raises five points on appeal. We address her points two and five first. Mother's point two on appeal states:
"THE TRIAL COURT COMMITTED PREJUDICIAL, REVERSIBLE AND PLAIN ERROR BY OVERRULING RESPONDENTS' MOTION IN LIMINE TO DISMISS THE CASE AND TERMINATE ITS JURISDICTION BECAUSE THE CONDITION WHICH HAD SO LONG `OSTENSIBLY' KEPT RESPONDENTS FROM REGAINING CUSTODY OF THEIR CHILDREN HAD BEEN ACCOMPLISHED AND THERE THEN AND THERE REMAINED NO REASON TO DEPRIVE RESPONDENTS OF THEIR CHILDREN."
The argument section following this point consists solely of the following statement: "Exhibit G speaks for itself."
Mother's point five on appeal states:

*506 THE TRIAL COURT COMMITTED PREJUDICIAL, REVERSIBLE AND PLAIN ERROR BY REMOVING A CHILD FROM HER MOTHER'S CUSTODY, IN ANOTHER COUNTY, WITHOUT ANY RATIONAL INDICIA OF FORSEEABLE HARM TO OR NEGLECT OF THE CHILD.
The argument section following this point consists solely of the following statement: "The evidence is uncontroverted."
An appellant must develop the contention raised in the point relied on in the argument section of the brief. Horwitz v. Horwitz, 16 S.W.3d 599, 605 (Mo. App. E.D.2000). If a party does not support the contention with relevant authority or argument beyond conclusory statements, the point is considered abandoned. Id. If supporting authority is unavailable, a rationale must be advanced explaining why such authority is unavailable. Luft v. Schoenhoff, 935 S.W.2d 685, 687 (Mo.App. E.D.1996). Mother's argument sections for her points two and five fail to meet the requisite standard, and thus we deem the points abandoned and presenting nothing for appellate review. Accordingly, Mother's points two and five on appeal are denied.
In her point one on appeal, Mother essentially argues that the trial court erred in quashing a subpoena served on the DFS to produce case records of another DFS case[14] because doing so deprived Mother of her theory of the case.[15]
Section 491.100.3 allows the trial court to quash a subpoena if it is "unreasonable and oppressive." The determination of reasonableness of the requirement to produce documents rests within the trial court's sound discretion. State ex rel. Rowland Group, Inc. v. Koehr, 831 S.W.2d 930, 933 (Mo. banc 1992). The trial court quashed the subpoena because it was "not prepared to require that the [DFS] bring in files for cases of unrelated parties that they may have, when it's been represented to [it] that there is nothing in those files which [Mother] could benefit from, when they're... confidential. ...[W]e just can't go through the Division's files and look for something that probably isn't relevant anyway." Counsel for the DFS, after reviewing the subpoenaed file, stated that the file made no reference to those involved in this case nor did it contain anything that "could be interpreted to refer, in any way, shape, or form, to this case."[16] Therefore, we find that the trial court did not abuse its discretion and did not err in quashing the subpoena served on the DFS to produce case records of another DFS case. Accordingly, Mother's point one on appeal is denied.
In her point three on appeal, Mother essentially argues that the trial court erred in denying her request to exclude Petitioner's witnesses from the courtroom during the Petition hearing because the witnesses were given the opportunity to orchestrate their testimony and to influence the trial court by their reaction to Mother's testimony.
The decision to invoke or not to invoke the rule excluding witnesses is left to the sound discretion of the trial court, *507 and it is subject to reversal only upon a showing of abuse and prejudice. Carlisle v. Kroger Co., 809 S.W.2d 23, 25 (Mo.App. E.D.1991). Mother provides no citations to the transcript to support her allegations. To the contrary, the trial court limited the testimony of a non-segregated witness to the introduction of or attempt to introduce records. Thus, Mother has not shown any abuse and prejudice resulting from non-segregation of witnesses. Accordingly, Mother's point three on appeal is denied.
Mother's point four on appeal states:
"THE TRIAL COURT COMMITTED PREJUDICIAL, REVERSIBLE AND PLAIN ERROR BY MAKING BALD FINDINGS, UNDER THE GUISE OF `CLEAR, COGENT AND CONVINCING' EVIDENCE, UPON INSUBSTANTIAL PROOF, AND AGAINST THE WEIGHT OF THE EVIDENCE."
Rule 84.04(d) requires points relied on to:
(A) identify the trial court ruling or action that the appellant challenges;
(B) state concisely the legal reasons for the appellant's claim of reversible error; and
(C) explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error.
Abstract statements of law, standing alone, do not comply with Rule 84.04(d). Mother's point four relied on does not comply with Rule 84.04(d), and thus preserves nothing for appellate review. Assuming Mother's point relied on refers to the sufficiency of the evidence to justify the trial court's judgment terminating parental rights over T.E., J.E., J.F., and S.F., we addressed the merits of this issue under Father's point one on appeal. Accordingly, Mother's point four on appeal is denied.
The judgment of the trial court terminating the parental rights of Father and Mother over T.E., J.E., J.F., and S.F. is affirmed. Father and Mother's appeal from the Finding of Jurisdiction by the trial court over A.R.F. is dismissed for lack of jurisdiction because the Finding of Jurisdiction is not a final judgment for purposes of appeal.
MOONEY, P.J., and SIMON, J., concur.
NOTES
[1] All statutory references are to RSMo. (1994), unless otherwise indicated.
[2] At this time, Father was in prison in Kansas. He was released in October 1992.
[3] Although the trial court ordered protective custody on May 20, 1992, the children could not be located until June 10 because Mother attempted to hide the children from the DFS. The children were found in a relative's car, with all of their possessions, preparing to cross the state line.
[4] Mother worked at a Wal-Mart.
[5] The mobile home was set up on land that Mother owned. The mobile home measured 12 feet by 48 feet.
[6] One driver stopped to take the children home.
[7] In total, the Petition hearing was four days. The first two days were June 29 and 30, 1999, and the last two days were August 17 and 18, 1999. Father testified on June 30. Father did not attend the last two days of the hearing because he was in Kansas from July 1999 to October 1999 to tend to juvenile matters related to his child with another woman.
[8] Mother testified on August 17 and 18, 1999.
[9] Mother testified that, when she had a refrigerator run by propane in the mobile home, she would store meat in a chest freezer located at a neighbor's house and then transfer the meat to a cooler to thaw before cooking it.
[10] Section 211.444 addresses termination of parental rights upon consent of a parent. The trial court judgment terminating the parental rights of Father and Mother was under Section 211.447. For our analysis, we assume Father meant to argue under the latter section.
[11] Father also argues that this "statutory scheme" violates his and Mother's right to due process and equal protection under the laws.
[12] Father raised this issue during discussion on Mother's oral motion to disqualify the judge, in which Father joined.
[13] A disposition hearing was held on December 13, 1999. At the close of the hearing, the trial court stated "prepare an order and judgment of disposition, which indicates that the child remains in jurisdiction of the Court, having previously found that there was jurisdiction, and that the child remain in alternative care, that the [DFS] be ordered to make no efforts toward reunification, and third, that the juvenile office be instructed to file a petition to terminate parental rights." On January 28, 2000, the docket sheet indicates "Order and Judgment of Disposition entered," however the entry is not signed or initialed by a judge. Additionally, Father's notice of appeal was filed on November 30, 1999. The finality of a judgment for the purpose of appeal is determined by the situation as it exists in the trial court at the time the appeal is sought. Johnson v. Great Heritage Life Ins. Co., 490 S.W.2d 686, 689 (Mo.App. 1973).
[14] The files subpoenaed relate to a case in which a woman whom had been subject to some DFS intervention or monitoring had gained custody of her children, went home that night, and killed the children and herself. The timing of the case possibly coincided with the return of the children to Father and Mother. At the Petition hearing, counsel for Mother argued that the file may contain evidence of the DFS's motivation and reason for pursuing Father and Mother at that phase of the case.
[15] In her brief, Mother identifies the theory of her case as: "the State's action in removing and keeping [her] children was a nearly classic portrayal of how destructive the nature of bureaucracy, and its power, can be, in an attempt to point out to the Court, just who suffers when its powers go unchecked. But it lacked a motive...."
[16] Mother's counsel also stated "I have no doubt that there is no explicit mention of the names of [those involved in this case]" in the subpoenaed file.