**In the Interest of J.L.M. and C.S.M., children under seventeen years of age.**

**M.S.K., Appellant,**

**v.**

**Greene County Juvenile Office, Respondent.**

**No. 24329.**

Missouri Court of Appeals, Southern District, Division Two.

Jan. 28, 2002.

M. Elise Branyan Barker, Springfield, for appellant.

Bill Prince, Springfield, for respondent.

NANCY STEFFEN RAHMEYER, Judge.

Mother appeals from the termination of her parental rights. She contends there was insufficient evidence to find that she failed to provide J.L.M. and C.S.M. with adequate food, clothing, shelter, or education and to find that the conditions which led to the juvenile court assuming jurisdiction over J.L.M. and C.S.M. had not been rectified. We disagree with Mother and affirm the juvenile court's judgment.

J.L.M., born February 26, 1997, was placed in the custody of the Greene County Division of Family Services ("DFS") for the last time on July 10, 1998. C.S.M., born December 19, 1998, was placed in the legal custody of DFS on December 31, 1998. On December 30, 1999, the Greene County Juvenile Officer filed a petition to terminate the parental rights of Mother and of the biological father ("Father"), citing several grounds. The juvenile court held a three-day hearing on the matter in August 2000 and April 2001. It held that the parental rights of Mother and Father should be terminated. Father did not take part in the hearing, and does not join in Mother's appeal of the juvenile court's decision to terminate both parents' rights.

The termination of parental rights is governed by §§ 211.442–211.490 of the 2000 Missouri Revised Statutes. In considering whether a parent's rights should be terminated a court must first determine whether clear and convincing evidence indicates that one or more of the grounds for termination under § 211.447 exist. Evidence is clear, cogent, and convincing when it instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true. *In the Interest of A.M.C., A.L.C., G.C. and V.L.C.,* 983 S.W.2d 635, 637 (Mo.App. S.D.1999). The clear, cogent, and convincing standard is more stringent than that requiring proof by the "preponderance of the evidence." *Id.*

If grounds exist, the juvenile court must next determine whether the termination is in the best interests of the child. § 211.447.5, RSMo 2000; *In the Interest of C.N.W. and K.S.W.,* 26 S.W.3d 386, 393 (Mo.App. E.D.2000). Only after both inquiries are resolved in the affirmative may a parent's rights be terminated.

A termination of parental rights will be sustained on appeal unless there is no substantial evidence to support the judgment, it is against the weight of the evidence, or it erroneously declares or applies the law. *In re the Interest of S.L.J. and E.M.J.,* 3 S.W.3d 902, 907 (Mo.App. S.D.1999). In our review we are mindful that the juvenile court was in a superior position to judge the credibility of the witnesses and that it was free to believe all, part, or none of the witnesses' testimony. *Id.* We consider the facts and reasonable inferences therefrom in the light most fa-

vorable to the juvenile court's judgment. *Id.*

■ The juvenile court found J.L.M. and C.S.M. to be abused and neglected. The court also found that the children had been in the jurisdiction of the juvenile court for over a year and the conditions leading to their removal continued to exist. One ground for termination adequately pleaded and proven is sufficient to support termination. *In the Interest of N.M.J., C.L.J., and C.L.J.*, 24 S.W.3d 771, 777 (Mo. App. W.D.2000). Although Mother challenges both grounds on appeal, if we affirm one ground for termination, we need not address the second. We find clear and convincing evidence to support the juvenile court's finding that J.L.M. and C.S.M. were abused and neglected by Mother.

Section 211.447.4(2) sets forth the criteria for terminating parental rights for abuse and neglect:

> (2) The child has been abused or neglected. In determining whether to terminate parental rights pursuant to this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:
>
> . . . .
>
> (d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development[.]

Clear, cogent, and convincing evidence supports terminating Mother's parental rights under § 211.447.4(2).

A DFS caseworker stated that J.L.M. came into DFS' care because of the totality of the circumstances and not because of one event. A review of the evidence indicates Mother's repeated failure to provide her children with the care necessary for their good health and development. From March 1994 to May 26, 2000, Mother had twenty-one hotlines and six mandated reports to the Missouri Division of Family Services. The reports included reason to suspect unsanitary living conditions, untreated illness or injury, failure to give medication, failure to provide clothing, medical neglect due to a chaotic lifestyle, improper feeding, and probable cause of neglect based on the poor condition of the household and unsafe and unsanitary living conditions.

Mother neglected the medical needs of her children. Mother used marijuana just days before C.S.M. was born. Mother again tested positive for marijuana in June 1999, after both children had been placed in DFS' custody.

J.L.M. was born nine weeks early. Like his two older siblings, he had breathing difficulties. Dr. Kathleen Rice, a physician who specializes in treating babies with apnea [1], saw J.L.M. when he was two days old. She described him as quite ill and in respiratory distress. J.L.M. was discharged from the hospital approximately a month later, on March 30, 1997, with instructions that he be on an apnea monitor and receive medication to stimulate his breathing. Mother went through intensive training concerning the monitor and J.L.M.'s condition. Mother called the doctor on April 1st saying the monitor alarm was going off all the time; however, she failed to take the baby to doctor's appointments in the next few days as scheduled. She finally took the baby to the doctor on April 8th, and the doctor admitted him to the hospital because of the frequent and

---

**1.** "Apnea" is defined as "transient cessation of respiration." MERRIAM WEBSTER'S COLLEGI-ATE DICTIONARY 54 (10th ed.1999).

severe apnea monitor alarms. The alarms slowed while in the hospital even though the only initial care given was the medication that had been prescribed when J.L.M. left the hospital in March. Dr. Rice was concerned that the baby was being exposed to cigarette smoke and being carried around too much, causing him to be unnecessarily exhausted.

J.L.M. was released from the hospital on April 10th, two days after admission. Mother gave a false telephone number to the nurses when they stressed to her the importance of having a telephone available to her in case the apnea monitor alarm sounded at home. Mother left the hospital without J.L.M.'s medication.

Mother brought J.L.M. back to the apnea clinic on April 15th. The apnea monitor indicated over 400 alarms in a 44–hour period. It was determined these were significant alarms and the majority of the alarms did not indicate any resuscitative efforts. J.L.M. suffered brain damage between April 10th and April 15th, while in the care of Mother. It is Dr. Rice's opinion that the brain damage is permanent and is the result of Mother's failure to respond to the apnea monitor's alarms. During her testimony Mother denied that J.L.M. had brain damage. The psychologist who performed a psychological evaluation of Mother testified that Mother revealed she did not fully utilize the monitor and was resistant towards using it. J.L.M. was admitted into the intensive care unit immediately upon being seen at the apnea clinic on April 15th and was there for four and one-half weeks. As a result of these events J.L.M. was placed in the care of the Webster County Division of Family Services from April 22, 1997 to December 15, 1997.

J.L.M. was again placed in DFS' care on July 10, 1998, after his pediatrician wrote to DFS with concerns about J.L.M.'s care. He stated that J.L.M. was malnourished because of a lack of caloric intake. He described J.L.M. as "emaciated." He expressed extreme concern for Mother's ability to care for J.L.M. because Mother did not keep doctor appointments, did not follow medical instructions for caring for J.L.M., and did not give him enough food.

C.S.M. was placed in the custody of DFS as a result of Mother testing positive for marijuana while J.L.M. was in foster care and intensive services were being offered to Mother by DFS. J.L.M. and C.S.M. have a combination of behavioral, developmental, and physical problems that require extensive services by outside professionals, as well as continuation of treatment in the home from the children's caretaker. Mother did not complete the services requested of her by DFS such as parent-child interaction therapy and individual counseling. The physical therapist who worked with J.L.M. noted that she did not see progress with him in his at-home program while he was in Mother's care, but that he "blossomed" when he entered foster care and improved significantly.

Mother's lack of commitment to J.L.M. and C.S.M. is apparent in many other ways as well. She did not visit J.L.M. from October 1998 to December 1998 and missed visits with both children from October 1999 through January 2000. She was late to most of the visits she attended. By the last day of trial Mother had seven children, two of whom had been born after J.L.M. and C.S.M. were taken into DFS' custody. Several professionals assisting Mother expressed concern that the number of children in Mother's household limited her ability to provide adequate care for them. A counselor and one of the DFS workers testified that Mother took no responsibility for her children being in DFS' care. During a continuation of the hearing Mother gave birth to a daughter who she took from the hospital intensive care unit when she was a newborn to prevent DFS

taking custody of her. As a result, kidnapping charges were pending against Mother on the last day of trial.

Mother moved frequently thereby creating an unstable household. Her probation officer testified that Mother is "transient in nature, and she moves often." The officer believed Mother had moved at least ten times in the last two years. The DFS worker assigned to Mother from July 1998 until February 2000 testified that Mother moved nine times while she was working with her. Mother testified that she had moved nine times since April 1998. On the last day of trial Mother agreed that she was not currently able to be in a stable home.

Not only would Mother's frequent moves impair the children's development, but the condition of her home constituted neglect as well. In January 2000 a Christian County DFS worker responded to a hotline call concerning Mother's filthy living conditions. The home was dirty, there was soured milk on the table, three to four days worth of dirty dishes were in the sink, and clothes were everywhere. One child who had severely crossed eyes was not wearing his prescription glasses.

In April 2000 a sheriff's deputy went to Mother's household in response to a request by Mother's caseworker because of the caseworker's inability to make contact with Mother. Father, a four-year-old child, and a two-year-old child were in the house when the deputy arrived. Mother arrived later with a six-month-old infant. The deputy testified about the filthy conditions of the home. He found broken glass, screwdrivers, nails, and toys strewn about the front porch. In the backyard was a burn pile with partially burned diapers, bottles, cans, broken glass, and nails, with a child's play car parked at the edge of the pile. Dried animal feces were found in every room of the house. The deputy detected a rotting garbage smell that he

described as "almost a dead animal smell." The children were dirty, unkempt, and one child was asleep on the hardwood floor of a bedroom. Decaying food and dirty clothes were strewn about the house, and the bedrooms were so messy with dirty clothes that there was no floor space to walk upon. The sink in the bathroom was stopped up and overflowing with putrid water that had bugs floating in it. The toilet was non-functional and had cigarette butts floating in it. The bathtub had dried feces in it, and the clothes on the floor in the bathroom had rotting food encrusted on them.

The deputy testified that other deputies had been to the house nine times between January 2000 and August 2000 on a myriad of complaints, including animal neglect, civil disturbances, and domestic-related situations. Mother reported violence between Father and her in the past. She claimed that Father kicked her in the stomach knowing she was pregnant, and that he "constantly yells, threatens me, and throws things in my home." The history of the couple seems to be that they are together off and on, with Mother at times stating that she will not see Father again. The evidence indicates that Mother has lied to caseworkers about whether Father was living with her. Mother testified on the last day of the termination hearing that she attributes six of her seven children being in foster care to her immaturity and her being in a co-dependent relationship with Father. Despite this, Mother married Father during the continuance of the termination hearing.

Mother never paid child support for J.L.M. and C.S.M. while they were in DFS' care, despite that being a requirement of her treatment plan. She provided minimal sporadic in-kind support, but never paid the ten-percent of her earnings as required by the treatment plan. This was so despite there being evidence that Mother had income.

The plethora of evidence supports the juvenile court's finding that Mother abused and neglected J.L.M. and C.S.M. The children have no bond with Mother. The facts of this case clearly indicate that Mother showed very little interest in J.L.M. and C.S.M., and certainly had a lack of commitment towards the children. This emotional and physical lack of care damaged both children.

The evidence supports the juvenile court's termination of Mother's parental rights based on Mother's abuse and neglect of J.L.M. and C.S.M. The juvenile court's judgment terminating Mother's parental rights to J.L.M. and C.S.M. is affirmed.

GARRISON, P.J., and PREWITT, J., concur.

