103 S.W.3d 319 (2003)
In the Interest of B.C.K. and K.S.P., children under seventeen years of age.
L.R.K, Appellant,
v.
Greene County Juvenile Office, State of Missouri, Respondent.
Nos. 24874, 24876.
Missouri Court of Appeals, Southern District, Division Two.
March 24, 2003.
Motion for Rehearing and Transfer Denied April 7, 2003.
Application for Transfer Denied May 27, 2003.
*321 Lois M. Zerrer, Zerrer & Pruitt, LLC, Springfield, for appellant.
Bill Prince, Springfield, for respondent.
Motion for Rehearing and Transfer to Supreme Court Denied April 7, 2003.
NANCY STEFFEN RAHMEYER, Chief Judge.
Introduction
L.K. ("Mother"), the biological mother of B.C.K and K.S.P. (collectively, "children"), appeals from the termination of her parental rights.[1] Mother contends the juvenile court's findings that Mother abused and/or neglected the children and failed to rectify conditions that led to the children's removal from her custody were not established by the evidence, the evidence did not establish the conditions would not be remedied, and the court's decision was against the weight of the evidence. We agree. We find insufficient evidence to support a finding that Mother was unable to provide a safe, stable and appropriate home environment, we further find that Mother complied with her treatment plan and an absence of evidence that Mother was incapable of caring for the children at the time of the termination hearing; and, therefore, we reverse the termination of Mother's parental rights.
The termination of parental rights is governed by §§ 211.442-211.490[2]. In considering whether a parent's rights should be terminated, we must first determine whether clear and convincing evidence indicates that one or more of the grounds for termination under § 211.447 exist. In the Interest of J.L.M., 64 S.W.3d 923, 924 (Mo.App. S.D.2002). "Evidence is clear, cogent, and convincing when it instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." Id. at 924. See also In the Matter of C.M.B., 55 S.W.3d 889, 893 (Mo. App. S.D.2001).
Where multiple statutory bases for termination of parental rights are found, in order to affirm the judgment only one of the statutory grounds must be proven and the court must find that the termination is in the best interests of the children. J.L.M., 64 S.W.3d at 924-25. See also In the Interest of R.J.B., 30 S.W.3d 868, 870-71 (Mo.App. S.D.2000); In re the Interest of S.L.J., 3 S.W.3d 902, *322 907 (Mo.App. S.D.1999). Only after both inquiries are resolved in the affirmative may a parent's rights be terminated. J.L.M., 64 S.W.3d at 924.
The trial court's decision to terminate parental rights will be sustained on appeal unless there is no substantial evidence to support the judgment, it is against the weight of the evidence, or it erroneously declares or applies the law. S.L.J., 3 S.W.3d at 907. In our review, we are mindful that the juvenile court was in a superior position to judge the credibility of the witnesses and that it was free to believe all, part, or none of the witnesses' testimony. Id. Furthermore, the standard of proof may be satisfied even though the trial court has contrary evidence before it or evidence in the record might support a different conclusion. C.M.B., 55 S.W.3d at 893. "Termination of parental rights is one of the most serious acts courts are empowered to perform." In the Interest of B.S.B., 76 S.W.3d 318, 324 (Mo.App. W.D.2002). As petitioner, the juvenile officer bears the burden of proof, which must be met by the presentation of substantial evidenceevidence that, if true, has probative force upon the issues. Id. We consider the facts and reasonable inferences therefrom in the light most favorable to the juvenile court's judgment. Id.
Mother has a mental illness. She has been diagnosed with schizoaffective disorder (bipolar type) and borderline personality disorder. She has had many problems stabilizing her medications prior to and since the diagnosis; however, she has been generally compliant in taking her medications. By her own recount of her medical history, she has had a substance abuse problem.
The Missouri Division of Family Services ("DFS") has had extensive contacts with Mother. There were many hotline calls concerning Mother's parenting; however, all of those were unsubstantiated with the exception of one in 1995 concerning the chaotic lifestyle of Mother by allowing abusive men into her life. In February of 1995, C.P., Mother's boyfriend and father of K.S.P., consistently and frequently abused Mother. On February 8, 1995, Mother told a police officer and a DFS worker that she and C.P. got into a fight, during which C.P. grabbed her by the neck and "twisted her stomach." She also reported that C.P. had held her down and "shot her up with drugs." Mother refused to file charges against C.P. because she was afraid that if she filed charges, C.P. would never see his children again. Upon the DFS worker's prompting, Mother agreed not to return to her apartment and promised to stay with the children at her neighbor's residence.
On February 9, 1995, a conference was held regarding Mother and the children. Mother was told that she must go to a safe shelter, obtain an ex parte order against C.P., obtain a drug and alcohol assessment which might include a urinalysis, locate other housing once she left the shelter, and not reveal her location to C.P. Mother agreed and, along with the children, was transported to a safe shelter via taxicab; however, on February 14, 1995, a hotline report was made alleging that Mother and her children left a safe shelter and returned to their apartment. Upon their return C.P. punched Mother in the stomach, causing her to vomit.
On February 22, 1995, DFS received a hotline report alleging that Mother had stated that C.P. took the children and she had to go with him to get the children back. A DFS worker was unable to contact Mother and, upon further investigation, learned that Mother's mother had called the Springfield Police Department to make a Missing Persons Report. In an effort to contact Mother, a DFS worker *323 spoke to the assistant manager of Mother's apartment building who reported that Mother had stated that C.P. had taken the children to his parents' home in Rogersville, Missouri and Mother went with him. When C.P.'s mother tried to return Mother and the children to Springfield, C.P. tried to run the car off the road. The apartment manager also reported that when Mother's neighbor had tried to take Mother to a store, C.P. followed them. The apartment manager had to call security to get C.P. to leave the premises on at least two different occasions. C.P. had been driving a stolen truck during this time period and was subsequently arrested.
Mother appeared unable to end her relationship with C.P. despite being told that her children would be taken into foster care if she did not get out of the relationship. After Mother's refusals to stay at a safe shelter, the children were taken into foster care, but they were returned to Mother eight weeks later when Mother ended the relationship with C.P. After the placement of the children in 1995, there were several hotlines concerning Mother's inability to supervise the children; however, all of them were unsubstantiated.
The current placement of the children commenced in March of 1999, when Mother, with the assistance of a community worker from Burrell Mental Health Center, sought to enter a treatment program for her mental illness and her self-reported substance abuse. The two of them arranged to have L.W., a friend of Mother's, take care of the children; however, L.W. was not immediately available to care for the children. Mother asked another friend, K.J., to care for the children in the interim; however, K.J. became concerned about her legal liability in caring for the children. She contacted DFS, which made a referral to the Greene County Juvenile Court. DFS was granted legal and physical custody of B.C.K., born September 16, 1991, and K.S.P., born December 17, 1994. Subsequently, after a home study was completed, DFS placed the children in the care of L.W., who had originally agreed to care for the children at Mother's request.
Mother successfully completed the treatment program and was referred for outpatient care; however, the children were not returned to her. Due to the children's behavioral problems, they were moved from L.W.'s home after about three months to a state foster home for approximately three weeks. The state foster parents requested that the children be removed from their home because of their vacation plans and the children were then placed with Mother at the Salvation Army Family Shelter on June 30, 1999 for a trial placement. This permissive placement with Mother was deemed unsuccessful when Mother was asked to leave the facility on July 19, 1999 because she had violated facility guidelines by not providing adequate control and supervision for the children. The specific incidents occurred when Mother went outside to smoke while the children remained in their room. The children were returned to foster care on July 21, 1999 and placed in a third foster home for less than a month. In August 1999, the children were moved to a foster home in Sikeston, Missouri, which was five hours from Mother's residence.[3] DFS asserted there were no closer, available behavioral foster homes that could handle both children and Mother insisted that the children remain together even though she acknowledged *324 that it would make visitation more difficult. Mother entered into a treatment plan with DFS for the return of her children.
Thereafter, Mother was allowed one unsupervised overnight visit in February of 2000. After the visit, the foster parents reported to a DFS caseworker that the children had stated that a male friend of Mother's was present the next morning when the children got up from bed. Mother did not deny the allegation and there was no evidence that this man was inappropriate in any way to be around the children, but DFS remained concerned that Mother would allow a male friend to visit during her first unsupervised visit with the children. There was also concern that Mother's medication was not proper because Mother appeared to be groggy and possibly unable to supervise the children.
Since the inception of her treatment plan with DFS, Mother has moved several times and has had several boyfriends although she remained married to R.K., the father of B.C.K.[4] R.K. had been imprisoned in the Texas Department of Corrections for eight and one-half years for "burglary habitation with the intent to commit theft." During his incarceration he sent letters to the children and completed a parenting-type program. R.K. was released in October 2000 and resided with Mother, but he was never granted visitation with B.C.K. Mother and R.K. were still residing together at the time of the hearing. The testimony of DFS caseworker, Melissa Young ("Young"), indicated that Mother did not maintain a safe, stable and appropriate home environment and that Mother had resided in numerous locations, including a mobile home, several apartments, a group home, friends' residences, motels, and the Missouri Hotel. Mother also had no consistent, full-time employment, but instead relied upon a part-time job and social security income.[5] Young was not the caseworker at the time of the termination hearing.
The caseworker at the time of the hearing, Cassie Birch ("Birch"), based her opinion that Mother's parental rights should be terminated on Mother's previous record with DFS. The records indicate that Mother complied with the treatment plans with the exception regarding the "stable home environment" as set forth herein. Birch admitted the current home was appropriate for the children. Both Birch and Young admitted that Mother substantially complied with her treatment plan. Both admitted that Mother's "parenting" abilities were not of concern to DFS, only her stable home life and choice of partners. DFS's complaint about R.K. was his previous incarceration. Neither caseworker had discussed Mother's progress with her psychologist or the other mental health professionals that worked with Mother over a period of years. Prior to making their recommendations to terminate Mother's parental rights, neither caseworker took into account the medical opinions of the psychologist or psychiatrist that Mother was able and ready to take care of the children.
Contrary to the DFS recommendations, Mother's psychologist and psychiatrist did *325 not recommend the termination of Mother's parental rights. Mother's psychologist, Dr. Suzanne McKenna, indicated on May 1, 2001 that Mother's change in medication greatly improved her mental status. The psychologist indicated that Mother would be able to show more of what she was capable of and appeared more stable on her medication than at any other time in the past. She noted significant changes in Mother's mental status since the medication change.
In a follow-up report dated November 6, 2001, Dr. McKenna indicated that Mother's mental status remained consistent and stable even while working on an effective transition of R.K. returning to her life. There was no significant swing in mood nor a resurgence of psychotic symptomatology. Dr. McKenna'a confidence in Mother's ability to provide a stable environment for the children had increased during the previous six months. She stated that Mother had a better awareness of her mental illness, was motivated to engage in treatment designed to help her remain stable and followed through with recommendations concerning several support groups for her illness. Dr. McKenna indicated that Mother had effectively dealt with numerous stressors over the course of the past six months which had tested her ability to cope effectively and Mother had withstood the stressors without any noticeable decompensation.
Likewise, Mother's psychiatrist, Dr. Jeffrey Jenkins, indicated in a letter dated May 21, 2001 that he had worked with Mother on issues of recovery, dysfunctional personal relationships and consistency in compliance with treatment recommendations. He stated that it was "quite clear that she genuinely loves and is concerned for her children." He noted Mother's improved mood stability, compliance with her medication and therapy appointments and a greater capacity to disengage from codependent relationships while insisting upon healthier interactions. He further stated that he did not endorse permanent termination of Mother's parental rights as he felt she was demonstrating significant progress in her overall treatment with a much more consistent presentation and she was less prone to erratic and irrational behaviors. He suggested a six-month continued observation for an analysis of Mother's ability to provide a safe and supportive home environment for the children.
On November 16, 2001, Dr. Jenkins indicated that Mother continued to keep appointments with her psychotherapist for treatment, complied with all prescribed medications and sought counseling with her husband in couple's therapy on her own initiative. He noted an overall improvement in her mood and mood stability, improvement in her insight, development of more effective and mature coping skills and better decision-making. He further stated that Mother was more assertive and less prone to assume a passive, victim role in her relationships. He was optimistic about her prognosis and believed reunification with her children was an achievable goal. He stated that intensive family therapy and supervision would be necessary for reunification.[6] Additional facts will be recounted as necessary to a discussion of the issues.
On July 13, 2000, the Greene County Juvenile Office filed separate petitions to terminate the parental rights of Mother, the alleged biological fathers of both children, and the legal father of K.S.P. A hearing on those petitions was not held until May 22, 2001 and the hearing continued *326 on November 13, 2001. On March 13, 2002, the court entered its findings of facts and conclusions of law based on two separate grounds of § 211.447. The court found:
The child has been abused and/or neglected and was adjudicated to have been abused and neglected by the Juvenile Court of Greene County, Missouri. The Court previously found that the mother had a history of emotional and mental problems which interfered in her ability to properly parent the minor child; that the mother used and misused controlled substances which impaired her ability to provide adequate and proper care for the minor child; and that the legal father and the alleged biological father were both incarcerated and unable to provide care for the minor child.
As to the first finding regarding whether the children had been abused or neglected, the court made an affirmative finding under only one of the factors, that the parent had repeatedly or continuously failed, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development. With regards to Mother, the court found the "mother has been unable to provide a stable, appropriate environment for the minor child."
Under the second finding, which is commonly referred to as the "failure to rectify" ground for termination, the court found that Mother had complied with every aspect of the treatment plan with the exception that Mother "did not successfully maintain a safe, stable and appropriate home environment." The court cited Mother's association with L.B. as a potential threat to the children.[7] The court specifically noted that during the permissive placement, Mother continued to demonstrate an inability to supervise and control the minor children. The court found that "due to mother's failure to assimilate services she did participate in, ... [she was] unable to adjust [her] circumstances and conduct to provide a proper home for the child."
In discussing the additional factors under § 211.447, the court found that the children had some emotional ties to Mother, Mother maintained regular contact and visitation, in-kind support was not provided by Mother,[8] no other services would enable placement of the children with Mother in an ascertainable period of time, Mother has shown a disinterest and lack of commitment to the children due to her lack of assimilation of services offered by the division, and the failure of Mother to take advantage of the services offered to her resulted in Mother failing to rectify the conditions that led to the removal of the children. The court further found that continuation of the parent-child relationship greatly diminishes the children's prospects for early integration into a stable and permanent home and the inability of Mother to provide proper care, custody and control for the children is potentially harmful to the children should they be returned to that environment.
*327 Mother presents three points relied on. In her first point relied on, Mother challenges the findings concerning Mother's neglect of the children. In her second point relied on, Mother contends there was no clear, cogent and convincing evidence that the conditions which led to the assumption of jurisdiction continue to exist or that there is little likelihood those conditions will be remedied at an early date. Finally, in her third point relied on Mother contends the trial court's findings pursuant to § 211.447.6 were against the weight of the evidence because the children have emotional ties to Mother, Mother maintained regular contact with and provided as much support as she was financially able, Mother made progress toward lasting parental adjustment that would enable the children to return to her care, and Mother had an active interest in and commitment to her children.
In her first point on appeal, Mother contends the evidence did not clearly, cogently and convincingly establish that she neglected her children, that she had a mental condition or chemical dependency that prevented her from providing necessary care, or she was unable to provide a stable, appropriate environment. We agree that the evidence does not support a finding that Mother had a mental condition or chemical dependency that prevented her from providing necessary care. In fact, the trial court found that she did not have a mental condition or chemical dependency that prevented her from providing necessary care. All that appears to be required in § 211.447.4(2) is that the children have been neglected.[9]
In making its determination of whether to terminate parental rights for neglect, the trial court must consider and make findings on four factors, which are conditions or acts of the parent, namely: (a) a mental condition shown to be either permanent or such that there is no reasonable likelihood of its reversal and which renders the parent unable to knowingly provide necessary care, custody and control of the child; (b) a chemical dependency preventing the parent from consistently providing necessary care, custody and control of the child and which cannot be treated to enable such care, custody, and control; (c) a severe act or recurrent acts of physical, emotional or sexual abuse toward the child under circumstances indicating that the parent knew or should have known of such acts; and (d) a repeated or continuous failure by the parent, although able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development. § 211.447.4(2)(a)-(d). The children were returned to Mother eight weeks later after Mother ended the relationship with C.P. That alone cannot serve as the basis for termination of parental rights. To terminate parental rights, the court must make an affirmative finding on at least one of the factors in § 211.447.4(2). In re S.L.B., 964 S.W.2d 504, 507 (Mo.App. W.D.1998); See also In the Interest of B.S.B., 76 S.W.3d 318 (Mo.App. W.D.2002); In the Interest of D.L.M., 31 S.W.3d 64 (Mo.App. E.D.2000).
The juvenile office contends that to terminate parental rights under § 211.447.4(2) there must simply be evidence of neglect or abuse in the past. While "neglect" is not defined in § 211.447, section 210.110(9) defines the term as the "failure to provide, by those responsible *328 for the care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well-being." In the Interest of J.L.B., 9 S.W.3d 30, 35 (Mo. App. W.D.1999). There was evidence of that in February of 1995, when Mother was the subject of a hotline investigation by DFS due to domestic violence and drug abuse which led to the juvenile court placing the children into protective custody. Mother's inability or unwillingness to protect the children from C.P. was adjudicated neglect.[10] We reject the argument of the juvenile court that a mere finding of previous neglect is sufficient to support a termination of parental rights.
The children came into the care of DFS in 1999 despite Mother's good faith efforts to work with her social worker to provide adequate care for the children while she voluntarily sought treatment for her mental illness and substance abuse, and not because of any specific incident of neglect or abuse of the children. We note that, while the juvenile court considered Mother's mental condition and history of self-proclaimed substance abuse, it did not find such factors to be a basis for its decision and found no instances of physical, emotional, or sexual abuse of the children. The juvenile court instead found that Mother continuously failed to provide the children with adequate food, clothing, shelter or education, or other care and control necessary for the children's physical, mental, or emotional health and development. Substantial evidence does not support that finding.
There were no instances where Mother failed to provide the children with adequate food, clothing, shelter or education. Mother's efforts in 1999 to seek treatment for herself cannot be the basis for the neglect finding. Nor can Mother's relationship with L.B. be sufficient to terminate her parental rights. Other than the 1995 adjudication of neglect due to domestic violence, Mother only had two unsupervised visits with her children. To terminate Mother's parental rights based on her behavior of leaving the children for short periods of time to smoke and allowing a male in her home on one occasion does not rise to the level of clear and convincing evidence that Mother refused to provide a safe, stable home. When DFS objected to Mother's association with L.B. and told her to end the relationship, she did so. Likewise, there was no evidence that the male "friend," who was at the second visitation was inappropriate in any way for the children. Point I has merit.
We next turn to Point II, a contention that substantial evidence does not support the court's finding that Mother failed to rectify the conditions that caused the placement of the children in foster care. The assumption of jurisdiction was the request of K.J., Mother's friend, for legal assistance in caring for the children.
The evidence was clear that Mother not only participated in every class offered by DFS, but also initiated services for herself in parenting classes, substance abuse programs, and marital counseling for herself and R.K. when he came back into the household. Although Mother had several homes, DFS always had a phone number through which she could be reached. Mother is currently on social security disability, which DFS admits relieves her of the obligation to find employment per the treatment plan and relieves *329 her of a child support obligation. Mother provided documentation of regular attendance in Alcoholics Anonymous meetings and substance abuse counseling. Mother cooperated with DFS in providing information whenever requested. Mother regularly attended parenting classes, therapy, marital counseling, and substance abuse meetings. Mother has not tested positive for alcohol or drugs while in the treatment program. Despite the great inconvenience of traveling to Sikeston, Missouri from Springfield, Missouri, Mother visited with her children on every scheduled monthly visit save one, at which time she experienced a medical illness. Mother often arranged her own transportation for visits with the children and had to travel for five hours on the bus for a two-hour visitation. After the termination petition was filed, Mother's phone contact with the children was discontinued when the foster parents reported that the children were upset after a discussion with Mother regarding the upcoming termination hearing. The records of DFS are replete with indications of a close bond between both children and Mother despite the long separation and the considerable hardship for visitations.
At the time of the hearing, Mother's medication difficulties had been addressed and monitoring had kept her at a stable level. Although in the early part of the treatment plan Mother did not maintain a stable residence and resided in numerous locations, Mother had maintained a clean and suitable residence for approximately eleven months at the time of the hearing. Although Mother did not attend parenting classes until 2001, Young and Birch testified that Mother's parenting abilities were never really at issue so they were not concerned about the parenting classes and that her homes have always been appropriately clean for the children. Mother also has enrolled in classes and has progressed toward her GED.
Mother had associated with several individuals with whom DFS was concerned due to their involvement with alcohol, criminal histories, and prior incidents of domestic violence with Mother. Mother resides with R.K., who since his return has been in heated verbal confrontations with Mother and on one occasion struck Mother. Mother brought these incidents to the attention of DFS. Mother claimed the arguments were over R.K.'s use of alcohol and Mother's refusal to allow alcohol in the house. She claimed the issues have been resolved through counseling with R.K. She sought marital counseling on her own for those issues. Mother's living with her husband who has served his sentence for burglary is not a sufficient reason for terminating her parental rights at this time.[11]
While Mother did attend substance abuse programs, Mother was found to be in possession of alcohol at her residence on one occasion, admitted to consuming whiskey on one occasion, and did not immediately submit to a random alcohol and drug test until a conference with her attorney. When she did submit to the test, the test result was clean. Substantial evidence does not support a termination of parental rights on this basis alone.
The availability of further services and Mother's assimilation of the services offered was disputed. Although there was conflicting evidence as to the services offered by DFS in the past, there was testimony from the mental health professionals that additional services would allow for an earlier return of the children to the Mother. *330 Mother's therapists, arranged through Mother's own efforts, had been providing all of the counseling. Family counseling was never offered by DFS.[12]
The court relied upon Mother's lack of "assimilation" of services to determine that Mother showed a lack of commitment to the children. While there is evidence to support that finding, particularly in the early part of Mother's treatment plan, there is no evidence to support that finding at the time of the hearings.[13]
Thus, the conditions which led to the children being brought into foster care in 1999 no longer exist and substantial evidence does not exist to support a finding that Mother was incapable of caring for the children at the time of the termination hearing. We find that substantial evidence does not support a finding that Mother failed to rectify the conditions which led to the children's removal from Mother's custody. Mother's second point is also granted. Because neither ground for termination is supported by substantial evidence, we must reverse the termination of Mother's parental rights.[14]
PREWITT, P.J., concurs.
SHRUM, J., dissents in separate opinion.
KENNETH W. SHRUM, Judge, dissenting.
I respectfully dissent. This record persuades me that Mother's neglect of these children was proven by clear, cogent, and convincing evidence, and that the juvenile court did not abuse its discretion in finding that termination of Mother's rights was in the children's best interests.
It is of paramount importance that courts look to the totality of a parent's conduct, both prior to and after the termination petition has been filed. In re A.S., 38 S.W.3d 478, 485 (Mo.App.2001). A parent's conduct after the filing of the termination petition cannot be the sole consideration of the court's decision. In re N.M.J., 24 S.W.3d 771, 780[10] (Mo.App.2000). Stated otherwise, evidence that a parent neglected his or her children before the termination petition was filed is not erased by evidence of improvement and stabilization of the parent's life after he or she received a termination petition. In the Interest of J.L.F., 99 S.W.3d 15, 20 (Mo. App. S.D. 2003). "Otherwise a parent can always argue that she [or he] has reformed since the filing of the petition, reformation usually occurring while the child is away." In the Interest of J.M.L., 917 S.W.2d 193, 196[6] (Mo.App.1996). For these reasons, a parent's conduct after the termination *331 petition has been filed may not be compelling. N.M.J., 24 S.W.3d at 780[13].
Here, Mother has an extensive history of contacts with the Division of Family Services extending back to 1995. This history and other evidence establishes she has a mental illness and a long-term inability to stabilize her medications, both before and after her illness was diagnosed. The record supports a finding that for many years Mother had only a minimal interest in dealing with this problem, choosing instead to abuse drugs, alcohol, follow a chaotic lifestyle, and subject her children to an unsafe, unstable, and inappropriate environment. This included living with men who abused Mother, exposing the children to the violent behavior of others, living with felons, and repeated temporary living arrangements and residence changes. By early 1999, the children's behavioral problems were such that they had to be placed in a behavioral foster care home. It was reasonably inferable that the children's problems resulted from Mother's repeated and continuous failure to perform the duties with which she was charged by law and conscience. That is neglect. See In re. S.L.N., 8 S.W.3d 916, 922 n. 5 (Mo.App.2000).
As I understand it, the majority's reversal is based primarily on evidence of Mother's reformation and its "finding" that "the change in Mother's medical condition precipitated the changes in Mother's stability and not a lack of commitment on the part of Mother." See n. 13. I acknowledge there is substantial evidence of Mother's improvement, especially in the six- to eight-month period before trial, after she faced a termination suit. This evidence, however, does not establish that the juvenile judge's determination was unsupported by clear, cogent, and convincing evidence. In re C.M.B., 55 S.W.3d 889, 893[5] (Mo.App.2001). The juvenile judge could reasonably have inferred Mother's long-standing poor medical condition was, in large measure, self induced; that it only improved when she finally curtailed her drug and alcohol habits (habits of obvious higher priority than her children's welfare until she faced losing them) and began taking necessary medication on a regular and ongoing basis. Based on her history, the juvenile judge could have concluded that reunification or other stress on Mother would likely result in Mother's return to her self-destructive habits.[1]
More than that, even with her change in "medical condition," Mother was not ready for reunification. Dr. Jenkins, her psychiatrist, suggested a six-month continued observation period, followed by an analysis to see if Mother was able to provide a safe, supportive home environment for the children. He also opined that intensive family therapy and supervision would be necessary for reunification. In contrast, the DFS workers, who had worked with Mother since 1995 and thus had more long-term experience with her, recommended termination now.
No doubt the juvenile judge was aware that "[t]he past provides vital clues to the present and future[;]" that "[p]ast events shape the future[;]" and "`[t]o allow only review of very recent events is both short sighted and dangerous.'" J.M.L., 917 S.W.2d at 196 (citations omitted). He obviously concluded that evidence of Mother's reformation in the post-termination *332 suit period was not compelling and did not erase evidence of her prior neglectful conduct. On this record, that was his prerogative. N.M.J., 24 S.W.3d at 780[13]. Based on what I view as clear, cogent, and convincing evidence in the record of Mother's neglect of her children, I would affirm.
NOTES
[1] The Greene County Juvenile Office filed separate petitions to terminate Mother's parental rights to B.C.K. and K.S.P.; however, the two petitions were heard together and are now consolidated on appeal.
[2] All references to statutes are to RSMo 2000, unless otherwise indicated.
[3] Mother claims the move was due to bruises on B.C.K.; however, DFS records indicate that the children were moved because the prior home was only a temporary foster home.
[4] R.K. is not the father of K.S.P. The parental rights of R.K. were terminated at the hearing, as were the parental rights of the other alleged biological and legal fathers, but only Mother appeals. This decision concerns the findings and conclusions of the termination of Mother's parental rights to the children.
[5] DFS indicated at the termination hearing that Mother's disability waived any requirement of employment or child support.
[6] Mother's therapy was not the result of efforts by DFS, but rather was through Mother's own efforts with Burrell Mental Health Center.
[7] L.B. was Mother's boyfriend at one time and Mother's employer at a window cleaning service during the end of 1999 and the beginning of 2000. When DFS learned of the relationship between Mother and L.B., Mother was advised to terminate the relationship because of L.B.'s criminal past. The record does not disclose the details of L.B.'s criminal past. Mother then terminated the relationship.
[8] Support was not necessary due to Mother's disability.
[9] At oral argument, Respondent stated that literal reading of the statute indicates the statutory ground of § 211.447.4(2) is met for every child that enters into foster care due to abuse or neglect.
[10] There is no longer a requirement in § 211.447.4(2) that the neglect be "adjudicated."
[11] There was no evidence indicating that R.K. directly abused or neglected the children as he was absent due to his incarceration.
[12] At the first hearing on May 22, 2001, there was a concern that the foster parents were not taking the children to therapy on a regular basis; however, by the second hearing on November 13, 2001, apparently, the foster parents were making sure the children attended counseling regularly. In the years that the children have been in foster care, their behavior has been improving and they are now in consistent counseling.
[13] We are aware of the many cases that allows us to disregard recent changes in the behavior of the parent in finding that the parent failed to rectify the conditions that led to the assumption of jurisdiction. See In the Interest of A.S., 38 S.W.3d 478, 485 (Mo.App. S.D.2001); In the Interest of T.E., 35 S.W.3d 497, 503-04 (Mo.App. E.D.2001); In the Interest of N.M.J., 24 S.W.3d 771, 780 (Mo.App. W.D.2000). Under the unique circumstances of this case, we find the change in Mother's medical condition precipitated the changes in Mother's stability and not a lack of commitment on the part of Mother.
[14] We do not address Point III. In order to terminate parental rights, one or more grounds for termination must exist under § 211.447. In the Interest of J.L.M., 64 S.W.3d at 924.
[1] Although Dr. Jenkins testified it was "quite clear that [Mother] genuinely loves and is concerned for her [children]," it was reasonably inferable that throughout much of her children's formative years her attempts at self-satisfaction via drugs, alcohol, and revolving relations with various men (many of whom were abusive), overrode her "love" and "concern" for her children.