

# Missouri Court of Appeals

## Southern District

### en banc

IN RE THE ADOPTION OF:　)
H.D.D, R.N.D., AND S.F.D., minors,　)
　)
W.H.D. and S.G.D.,　)
　)
　　Petitioners-Respondents,　)
　)
　vs.　)
　)
S.M.D.,　)
　)
　　Respondent-Appellant.　)

No. SD36035

and

**Filed: November 13, 2019**

IN RE THE MATTER OF:　)
R.N.D. and S.F.D.　)
　)
W.H.D.　)
　)
　　Petitioner-Respondent,　)
　)
　vs.　)
　)
S.M.D.,　)
　)
　　Respondent-Appellant.　)

### APPEAL FROM THE CIRCUIT COURT OF JASPER COUNTY

Honorable Joseph L. Hensley, Associate Circuit Judge

### AFFIRMED IN PART; REVERSED IN PART AND REMANDED

S.M.D. ("Mother") and W.H.D. ("Father') are the parents of three children: H.H.D., a male child who was born in May 2000; R.N.D., a female minor child who was born in December 2001; and S.F.D., a female minor child who was born in April 2003 (collectively "the Children"). Mother and Father divorced on November 9, 2007. At that time, the trial court granted the parties joint legal and joint physical custody of the Children, with Father's residence designated for mailing and educational purposes. The trial court ordered Mother to pay $672.00 per month in child support beginning April 2, 2008. On February 21, 2008, Father filed a Motion to Modify and Mother filed a Counter-Motion to Modify on October 10, 2008. The modification was heard on November 6, 2009. Mother did not appear, was unrepresented, and she had moved to the state of Ohio. The court, on January 27, 2010, entered judgment and modified the custodial order granting Father, who was married to "Amanda" at the time of the hearing, sole legal and sole physical custody of the Children, "subject to the right of reasonable visitation by Mother in accordance with Father's Parenting Plan." The parenting plan in the modified judgment was set up for a significant geographical distance between Mother and Father.

Father and Amanda divorced in 2013. Father married the Petitioner, S.G.D. ("Step-Mother"), in March of 2015. Step-Mother brought three children into the marriage. The court denied the termination of Mother's rights to S.F.D., but terminated Mother's parental rights to R.N.D. and granted the step-parent adoption for R.N.D. on the grounds that Mother had abandoned R.N.D.[1] We affirm the judgment in part and reverse and remand in part.

---

[1] H.H.D. was dismissed from the termination of parental rights and step-parent adoption on the date of trial because he was no longer a minor.

Mother is a registered nurse and Father is a medical doctor. All three children have autism spectrum diagnoses,[2] though H.H.D. and S.F.D. are extremely high functioning. R.N.D., on the other hand, suffers a severe form of autism and will likely never be able to live independently. R.N.D. is on a "Sarah Lopez Waiver,"[3] which allows R.N.D. to be placed on Missouri Medicaid. R.N.D. is unable to be at home by herself, prepare her own food, and eat without oversight. She "perseverates" over things, such as food. Further, R.N.D. needs prompts and reminders for safety with cleaning, bathing, showering. She has a personal care assistant who works in the home of Father and Step-Mother. In addition, she has a service dog to help keep her calm.

Mother moved back to the Carl Junction area in October of 2010. At that time, the parties, without a court modification, began practicing an every-other weekend visitation schedule with the Children. In September 2015, this practice ended and Mother ceased visitation with R.N.D. Mother claimed Father told her "[i]t's very apparent you cannot handle [R.N.D.], and you will not be seeing her for some time." Father claims that Mother called him during one of R.N.D.'s meltdowns, and that Mother told him to

---

[2] Autism Spectrum Disorder includes:

> A. Persistent deficits in social communication and social interaction across multiple contexts . . . [.]
> B. Restricted, repetitive patterns of behavior, interests, or activities . . . [.]
> C. Symptoms must be present in the early developmental period (but may not become fully manifest until social demands exceed limited capacities or may be masked by learned strategies in later life).
> D. Symptoms cause clinically significant impairment in social, occupational, or other important areas of current functioning.
> E. These disturbances are not better explained by intellectual disability (intellectual developmental disorder) or global developmental delay. . . .

See https://www.cdc.gov/ncbddd/autism/hcp-dsm.html (page last reviewed Aug. 27, 2019) for complete criteria for 299.00 Autism Spectrum Disorder according to the American Psychiatric Association's fifth edition of its Diagnostic and Statistical Manual of Mental Disorders (DSM-5).

[3] This particular waiver exists for families who are over the typical income guidelines for Medicaid making a person ineligible for any other type of waiver.

"never bring her back and that [Step-Mother] and [Father] needed to pay for the damage that our daughter caused to [Mother's] home." Mother did not make any further attempts to see R.N.D. until March 1, 2018.[4]

In 2017, Mother sent the Children Easter cards. On January 23, 2018, Mother sent a text message to S.F.D., which read: "i have been tryi[n]g to get in touch with you. Please let me know you & [H.H.D.] & [R.N.D.] are doing ok. i love u & miss you terribly! love, mom[.]" Beginning March 1, 2018, Mother initiated contact with Father via text messaging requesting visitation with all of the Children. The dialogue between Mother and Father, from March 1, 2018 through March 31, 2018, was as follows:

> On Thursday, March 1, 2018, Mother sent Father the following text message:
> "i would really like the opportunity to see the kids . . . your thoughts?"
>
> On Friday, March 2, 2018, Father replied:
> "I've had a chance now to speak with both kids. [S.F.D.] is not happy you involved her friends. Their parents are also not happy. The kids have received your messages. They do not want to respond at this time."
>
> On Wednesday, March 7, 2018, Mother sent Father the following text message:
> "I want to star[t] visits in therapeutic setting with [H.H.D.] [R.N.D.] & [S.F.D.]…what are ur thoughts?"
>
> On Monday, March 19, 2018, Mother sent Father the following text message:
> "i want to star[t] visits in therapeutic setting with [H.H.D., R.N.D. & S.F.D.] . . . what are ur thoughts?"
>
> On Monday, March 19, 2018, Father replied:
> "It's an unrealistic expectation for [R.N.D.]. I spoke with the other two, they do not wish to do it."
>
> On Thursday, March 29, 2018, Mother sent Father the following text message:

---

[4] Mother told the court she did not challenge Father on him withholding R.N.D. in fear that Father would withhold the other two children.

"[Father,] i'd really like to see the kids. will you please encourage [H.H.D. & S.F.D.] to participate in a therapeutic setting visit? also, i want to see [R.N.D.] in a therapeutic setting which i don't feel is an unrealistic expectation. can we discuss this? thanks!"

On Saturday, March 31, 2018, Mother sent Father the following text message:
"please can we talk about visitation with HRS [sic] in a therapeutic setting? i'd love to see them!"

Father refused all visitation, stating that H.H.D. and S.F.D. did not want to visit Mother.

Mother filed a Motion to Modify on April 9, 2018, and alleged that Father has repeatedly denied her visitation with the Children. On April 17th, Father and Step-Mother filed a three-count Petition for Termination of Parental Rights and Step-Parent Adoption on behalf of the Children, asking the court to transfer legal custody of the Children to Father and Step-Mother. On April 23, 2018, Father and Step-Mother filed a Petition for Appointment of Guardian and Conservator for R.N.D. and a Petition for Emergency Appointment of Guardian and Conservator for R.N.D. Mother, between May 8, 2018 and May 30, 2018, again initiated contact with Father via text messaging requesting visitation with the Children. The dialogue between Mother and Father, from May 8, 2018 through May 30, 2018, is as follows:

On Tuesday, May 8, 2018, Mother sent Father the following text message:
"i'd like to see all the kids sometime on mother's day . . . can we talk about this?"

On Friday, May 11, 2018, Mother sent Father the following text message:
"i'd really like to settle all the issues between us without having to go through court . . . i'd prefer not to put the kids through it . . . and would like for them to see us amicably coming to a resolution . . . are u willing to talk to me about it?"

On Thursday, May 17, 2018, Mother sent Father the following text message:
"when can i see all the kids for visitation?"

5

On Sunday, May 20, 2018, Mother sent Father the following text message: "i'm sorry to learn of your cancer diagnosis. i am praying for you and our children."

On Saturday, May 26, 2018, Mother sent Father the following text message: "can we discuss therapeutic setting visitation with all 3 kids?"

On Wednesday, May 30, 2018, Mother sent Father the following text message:
"[Father,] i'd like to see all the kids"

On June 7, 2018, Mother filed a Motion for Therapeutic Visitations regarding all the Children. Twelve days later, on June 19, 2018, Mother filed a Motion for Family Access Order requesting visitation with the Children and for compensatory visitation with the Children. In between and after the filing of her motions, Mother again sent text messages to Father in June requesting visitation in June and for visitation on the Fourth of July. Step-Mother acknowledged she and Father received Thanksgiving cards from Mother addressed to the Children in 2018. Step-Mother testified she did not read R.N.D. her card. Furthermore, Step-Mother acknowledged receiving Christmas cards from Mother addressed to the Children. Step-Mother admitted she did not read R.N.D. her card, and that she (Step-Mother) threw it away.

On September 20, 2018, the trial court consolidated all cases, and scheduled Mother's Motion for Family Access to be heard on November 14, 2018, and all other matters were scheduled for trial on January 14, 15 and 16, 2019. On November 14, 2018, the trial court heard evidence on Mother's Motion for Family Access. After taking the matter under advisement, the trial court entered an Order on November 21, 2018, wherein the trial court stated "on an interim basis, [Mother's] request for relief by way of the family access and for therapeutic visits are denied, pending further order from the [trial

6

court] following the January hearing." On January 14, 15 and 16, 2019, the trial court heard evidence on the following cases:

- The juvenile/step-parent adoption (18AO-JU00131) involving the termination of Mother's parental rights and the adoption of R.N.D. and S.F.D. by Step-Mother;

- Two guardianship cases (18AP-PR00165 and 18AP-PR00166), which requested the trial court to appoint Step-Mother as legal guardian for R.N.D. and S.F.D.; and

- Mother's Motion to Modify (05AO-FC00723-02) requesting a modification of the current custody order.

The trial court found no clear and convincing evidence of neglect and noted that Mother has continued to pay child support for the Children for a total amount of $87,360 in total support and kept health insurance on the children. The court then found that prior to 2015 Mother's conduct would favor a finding that she did not intend to abandon R.N.D. The court found no in-person contact between Mother and R.N.D. for three years other than a chance encounter at a Target parking lot in 2016. Mother did not attempt to call or send text messages to Father to set up a visit with R.N.D. until March of 2018. The trial court further found that Mother "may have been correct that her cards, letters, gifts, or phone calls would not have got through to [R.N.D.], or that [Father] would not have allowed her custodial time, but with regard to [R.N.D.], *she never tried*." The trial court further found that "[t]he evidence is undisputed that [R.N.D's] autism is extreme, and the Court has taken her condition into account. [Mother] did not have the option of simply sending an e-mail or text message to [R.N.D]." The court stated, "[i]t appeared [Mother] had her fill of [R.N.D.'s] behaviors in September of 2015 and never tried again." The trial court noted the close proximity of the residences between Mother and Father, and "[n]evertheless, there was no evidence of any request to see [R.N.D.] until well into 2018." The trial court found that

7

after litigation commenced, [Mother] requested [Father] allow therapeutic visits with all of the [C]hildren, [R.N.D.] included. She also filed a motion to modify as well as a family access motion, but in truth, she did not need one to see [R.N.D.] at school or check in on her from time to time.[5]

The trial court noted that "[v]isiting [R.N.D.] at school likewise *could* have been problematic, but it was not impossible." Additionally, "[t]here was no evidence Mother had any idea who assisted with [R.N.D.'s] care, the names of her doctors and how she was doing physically, how she was doing at school, etc."

Missouri law requires that courts approach termination of parental rights in a two-step analysis. I*n re J.L.M.*, 64 S.W.3d 923, 924 (Mo.App. S.D. 2002). The first step requires the court to determine whether evidence exists under the law to terminate parental rights. *Id.* The focus here is not on the petitioners or the children, but on the biological parent whose rights could be terminated. This is a very high standard of proof, requiring "clear, cogent and convincing" evidence. *In re K.M.W.*, 342 S.W.3d 353, 359 (Mo.App. S.D. 2011). "The clear, cogent, and convincing standard of proof is met when evidence instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *In re C.M.B.R.*, 332 S.W.3d 793, 815 (Mo. banc 2011) (internal quotations and citation omitted), *abrogated on other grounds by S.S.S. v. C.V.S.*, 529 S.W.3d 811 (Mo. banc 2017).[6]

---

[5] As noted previously in this opinion, Mother requested therapeutic visits with the Children via texts with Father in March 2018, which was prior to the commencement of litigation in April 2018.

[6] If the court determines legal grounds for termination of parental rights exist, the second step of the analysis is whether the best interests of the children would be served by terminating the biological parent's parental rights. *In re J.L.M.*, 64 S.W.3d at 924. In this second step the court's focus expands to the children and the petitioners' burden of persuasion is less onerous, requiring only a preponderance of the evidence showing. *In re D.M.B.*, 178 S.W.3d 683, 689 (Mo.App. S.D. 2005). We do not address the second step.

Termination of parental rights "is an exercise of awesome power and strict and literal compliance with the statutory language is demanded. The party seeking to invoke the statute must carry the full burden of proof." *In Interest of Baby Girl W.*, 728 S.W.2d 545, 547 (Mo.App. W.D. 1987). Furthermore, statutes providing for the termination of parental rights "are strictly construed in favor of the parent and preservation of the natural parent-child relationship." *In re A.S.W.*, 137 S.W.3d 448, 453 (Mo. banc 2004).

> The bond between parent and child is a fundamental societal relationship. *In re Parental Rights to Q.L.R.*, 118 Nev. 602, 54 P.3d 56, 58 (Nev.2002); *see Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *see also Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). A parent's right to raise her children is a fundamental liberty interest protected by the constitutional guarantee of due process. It is one of the oldest fundamental liberty interests recognized by the United States Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). . . . The termination of parental rights has been characterized as tantamount to a "civil death penalty." *In re N.R.C.*, 94 S.W.3d 799, 811 (Tex.App.-Houston [14th Dist.] 2002); *In re Parental Rights as to K.D.L.*, 118 Nev. 737, 58 P.3d 181, 186 (2002). "It is a drastic intrusion into the sacred parent-child relationship." *In the Interest of P.C., B.M., and C.M.*, 62 S.W.3d [600,] 603 [Mo.App. W.D. 2001)].

*In re K.A.W.*, 133 S.W.3d 1, 12 (Mo. banc 2004).

The first hurdle the law mandates that the court address is whether there are grounds to terminate the biological mother's parental rights, and so that is where the court focuses its attention first. Petitioners rely on section 453.040(7), RSMo 2016.

> Prospective parents . . . may request a termination of parental rights incident to an adoption action under chapter 453. Chapter 453 does not speak to termination of parental rights; rather, it authorizes adoption without consent or with consent that has the effect of terminating parental rights.

*C.M.B.R.*, 332 S.W.3d at 806 (internal citation omitted). Section 453.040(7) provides, in pertinent part, that a parent's consent to an adoption is not required where, for a period of at least six months immediately prior to the filing of an adoption petition, a parent

9

willfully abandoned the child or willfully, substantially, and continuously neglected to provide the child with necessary care and protection.

Abandonment, however, "'is defined as the voluntary and intentional relinquishment of the custody of a child with the intent to never again claim the rights or duties of a parent.'" *In re J.M.J.*, 404 S.W.3d 423, 432 (Mo.App. W.D. 2013) (quoting *In re K.L.C.*, 9 S.W.3d 768, 772-73 (Mo.App. S.D. 2000)). "Abandonment is also defined as 'the intentional withholding by the parent of his or her care, love, protection and presence, without just cause or excuse.'" *Id.*

The petition for the termination of Mother's parental rights was filed on April 17, 2018. The court recognized that "[t]he intent to abandon, more often than not, is an inferred fact, determined by conduct not only within the statutory period, but also relevant conduct both before and after this period." The court stated it looked to "an objective consideration of [Mother's] behavior as a course of conduct."

Mother claims the judgment terminating her rights was against the weight of the evidence. Using the four-step process described in *Houston v. Crider*, Mother identified a challenged factual proposition (i.e., that Mother intended to abandon her children), identified all favorable evidence in the record supporting the existence of that proposition, identified the evidence in the record contrary to the belief of that proposition, and demonstrated why the favorable evidence failed to induce belief in that proposition. 317 S.W.3d 178, 187 (Mo.App. S.D. 2010). We agree that "the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition." *Id.* The evidence supporting the finding of abandonment of

10

R.N.D. is the confrontation between Mother and Father in 2015 and Mother's failure to visit after that time. The evidence does not support any finding that Mother intended to abandon her children. Looking at Mother's conduct concerning visitation with her children in the six months prior to the petition for termination being filed does not indicate an attempt to abandon any of her children. There was no question, as the court found in its rejection of the termination of Mother's parental rights to S.F.D., that the divorce was acrimonious and that Father allowed the children to dictate whether visitation would occur between H.H.D. and S.F.D. and Mother. Because of the severity of R.N.D.'s autism, there was no way to contact R.N.D. without Father's input and consent. Mother attempted to communicate with H.H.D. and S.F.D. through friends,[7] through Facebook, through texts, and prior to school. She was met with rejection. Whether it was as Mother testified that Father found out and the Children got in trouble or that she simply stopped trying to convince her children to see her, it does not change the fact that Mother tried to visit with the Children and was prevented constantly by Father from doing so. On February 15, 2018, even after previously being told by her son H.H.D. to "leave [him] alone," Mother texted several messages, including, "i love you with all my heart . . . I will NEVER give up on you or your sisters." She asked H.H.D. to pass along her love to R.N.D. and S.F.D. She sent multiple text messages from March of 2018 into September of 2018.

When S.F.D. quit responding to Mother's texts in 2016, Mother asked her what was wrong, what had happened, was she being threatened or punished. She specifically

---

[7] The court faulted Mother for trying to contact S.F.D. via texts to S.F.D.'s friends: "in a breach of etiquette, [Mother] sent text messages to some of [S.F.D.'s] friends, inquiring how [S.F.D.] was doing and requesting the friends have [S.F.D.] get in contact with her. Understandably, [S.F.D.] testified this embarrassed her."

asked S.F.D. if she was upset with Mother and asked her to tell her. She ended with "I love you, mom xo." When Mother heard nothing, she threatened to call the police for a "well check" which prompted Father to respond, "I told [S.F.D.] she can call if she wants to. She hasn't wanted to." Mother continued to try to get Father to have S.F.D. call. Mother requested her Thanksgiving visitation in 2016 but was told that S.F.D. did not want to visit her and Mother was denied visitation. After repeated texts from April through September 2017, S.F.D. responded, in September 2017, "Please don't text me." In 2018, after Mother tried to email S.F.D., Step-Mother accompanied S.F.D. to high school to effectuate a change of email address. Mother kept up with S.F.D.'s progress on the school web page and sent congratulatory comments and birthday wishes through text messages. On May 14, 2018, Mother found out that S.F.D. had a new phone and was not getting her messages. As the court noted, Father inappropriately relinquished the decision of whether to visit with Mother to S.F.D.

In March of 2018, Mother attempted to open up a dialogue with Father about seeing the Children. As the court noted:

> [Mother] requested visits with all three kids again in late March of 2018. She asked again in May, trying to set up something for Mother's Day. She received no replies. In May she sent [Father] another text message stating she wanted to settle their issues without going to court and putting the kids through that, and that she wanted the kids to see them come to an amicable resolution. She received no reply to that text or the next one asking for visits. She continued to request visits into June and July, but received no reply from [Father].
> Finally, [Father] and [S.F.D.] acknowledged receiving Thanksgiving and Christmas cards from [Mother] in 2018. [S.F.D.] said she threw them away and did not read them. [Mother] testified she also sent Easter Cards in 2017.

The trial court was puzzled by what Mother did not do. For instance, the court thought Mother could have gone to the school to see S.F.D.'s records. There is no evidence that

Mother would have been permitted to see those records.  Father had full legal custody.

Father was allowed to change S.F.D.'s email so that her own mother could not contact

her.  The court acknowledged that when Mother attended an event for H.H.D., Father and

Step-Mother grabbed the son and "shielded" him by turning their backs on her in a

protective manner.  Mother did not want to ruin her son's special day.  Mother was told

by S.F.D. that she would get in trouble when Mother appeared at school events.  There

was no question to the trial court that Mother's presence put the Children in the difficult

position of "being caught in the middle, having to negotiate her parents' feelings about

who to sit with, who to say 'hello' to first, etc."

> The court noted that some of Mother's concerns had merit:

> [Mother] constantly feared retaliation by [Father] withholding her visitation
> if she did not go along with his plans or request more time.  Arguably, [t]his
> *did* happen in late 2015 when [Father] told [Mother] that they would go
> back to the 2010 parenting plan when 1) [Mother] lived only a few minutes
> away, not several hundred miles, and 2) they had been exercising every
> other weekend visitation for five years. Further, when [Mother] later
> requested Memorial Day visitation in 2016, [Father] denied it based on a
> technical notice violation. [Father] correctly pointed out that he was simply
> following the 2010 Court order then in effect, but in light of the parties'
> practice the previous five years, it lends some credibility to [Mother's]
> perceived fears. In September of 2016, [Mother] told [Father] she intended
> to pick [up] [H.H.D.] and [S.F.D.] at 5:00 p.m. [Father] replied, "I have sole
> custody. He is staying. Feel free to take it to court. They will be there
> Monday evening [Mother's birthday] for dinner."[8]

The court properly noted:

> A long line of cases in Missouri and other states hold that when a custodian
> parent hinders communication with the other parent, then an abandonment
> cannot occur.  "A finding of abandonment is not normally compatible with
> a finding that custody has ended involuntarily." *In re L.M.*, 322 S.W.3d 564,
> 570[11-12] (Mo. App. S.D. 2010). In this case the evidence was not in
> dispute that [Step-Mother] assisted [S.F.D.] in changing her e-mail and
> changed her cell phone number, notably <u>the two ways</u> at the time [Mother]

---

[8] The court noted this was a two-way street as Mother labeled Father "evil" in her phone contacts and had used terms describing Father that are "beyond decency or excuse" during the marriage.

was attempting to contact [S.F.D.]. Under questioning from [Mother's] attorney, [S.F.D.] testified that she was not aware that [Mother] was trying to set up visits with [Father] in 2018. [Mother] also claims the back-to-back similarly curt text message replies on September 24, 2017 were both "obviously" from [Father]. Though this is possible, it is hardly the only explanation, and [Mother] ignores that after nearly a year of sending texts with no response, perhaps she might have thought "outside the box" and initiated another method to attempt to talk to the children -- one that did *not* involve sending text messages to [S.F.D.'s] friends at school.

The court concluded:

Though [Mother] has not filled the role of a model parent, no point would be served by terminating her parental rights to [S.F.D.] other than to punish her, and the Court heard no evidence this would outweigh any perceived benefit to [S.F.D.] at this point in her life that could not also be served by a less permanent and restrictive option such as guardianship.

The court denied the termination of Mother's parental rights to S.F.D.

As noted, Mother appeals the termination of her parental rights to the middle child, R.N.D., on the basis that the judgment was against the weight of the evidence in that, prior to the filing of a petition for termination of Mother's parental rights, Mother (1) requested visitation with R.N.D., (2) paid child support throughout the entire period that she did not have custody, (3) carried health insurance on R.N.D., (4) filed a motion to modify requesting joint legal and joint physical custody and requesting an increase in visitation, and (5) continued to request visits that were ignored by Father. Shortly after the petition for termination was filed, Mother filed a formal motion for therapeutic visitation and a family access motion. As did the trial court, we note that the lack of physical visitation is not the sole issue. Mother continuously attempted visitation during the six months prior to the filing of the motion for step-parent adoption. She paid child support and had health insurance for the Children. Although it was a double hurdle for Mother to attempt to contact R.N.D., who could not be texted and could not visit without

14

Father's assistance, Mother tried to send messages through the other children. She was also undermined by the admitted conduct of Step-Mother who tore up letters and cards to R.N.D. Father and Step-Mother did more than discourage Mother from visiting the children. All the evidence which supports the judgment denying termination of Mother's parental rights to S.F.D. supports the reversal of the termination to R.N.D.

We believe the trial court was influenced by Father's health. In March 2018, Father received a diagnosis that he suffers from neuroendocrine pancreatic cancer. Mother was not told of the diagnosis until April 3, 2018. Although the trial court was duly concerned about the health diagnosis of Father, the law does not change to allow Mother's rights to be terminated because Father wishes that his current wife care for their child. Therefore, the court must stringently follow the law regarding whether Mother intentionally abandoned her children.

> Abandonment has been defined as either "a voluntary and intentional relinquishment of the custody of the child to another, with the intent to never again claim the rights of a parent or perform the duties of a parent; or . . . an intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love, and his protection, maintenance, and the opportunity for the display of filial affection." *In re Watson's Adoption*, [] 195 S.W.2d 331, 336 (1946); *In re E.F.B.D.*, 245 S.W.3d 316, 324 (Mo.App.2008). "This largely presents an issue of intent, which is inferred from the parent's conduct." *E.F.B.D.*, 245 S.W.3d at 324; *In re Z.L.R.*, 306 S.W.3d 632, 635 (Mo.App.2010); *see In re P.L.O.*, 131 S.W.3d 782, 789 (Mo. banc 2004). Evidence of the parent's conduct, both before and after the requisite six-month period, may be considered. *In re J.B.D.*, 151 S.W.3d 885, 888 (Mo.App.2004). However, "[o]nly the parent's conduct prior to the filing of the petition for termination may be considered to establish the six-month period." *Id.* (emphasis added). The greatest weight must be given to conduct during the statutory period. *In re Adoption of C.M.B.R.*, 332 S.W.3d 793, 819 (Mo. banc 2011).

*In re G.T.M.*, 360 S.W.3d 318, 322-23 (Mo.App. S.D. 2012). An against-the-weight-of-the-evidence claim "denotes an appellate test of how much persuasive value evidence

has, not just whether sufficient evidence exists that tends to prove a necessary fact." *Ivie v. Smith*, 439 S.W.3d 189, 206 (Mo. banc 2014). This standard "serves only as a check on a circuit court's potential abuse of power in weighing the evidence, and an appellate court will reverse only in rare cases, when it has a firm belief that the decree or judgment is wrong." *Id.* This is a rare case where Mother has presented evidence, such as texts, the motions, the attempts at visitation, the difficulty of communication with a child who is at a severe level on the autism spectrum, which counters Father's evidence and that has not been rebutted by Father.

The judgment granting the step-parent adoption of R.N.D. and terminating Mother's parental rights to R.N.D. is reversed. The cause is remanded for further proceedings on the petition for guardianship of R.N.D. In all other respects, the judgment is affirmed.

NANCY STEFFEN RAHMEYER, J. – OPINION AUTHOR

JEFFREY W. BATES, C.J. – CONCURS

GARY W. LYNCH, J. – DISSENTS IN SEPARATE OPINION

DANIEL E. SCOTT, J. – DUBITANTE, WITH OPINION

DON E. BURRELL, J. – CONCURS IN J. LYNCH'S DISSENTING OPINION

WILLIAM W. FRANCIS, JR., J. – CONCURS

MARY W. SHEFFIELD, J. – CONCURS


IN RE THE ADOPTION OF:            )
H.D.D, R.N.D., AND S.F.D., minors,   )
                                  )
W.H.D. and S.G.D.,                )
                                  )
        Petitioners-Respondents,  )
                                  )
    vs.                           )
                                  )
S.M.D.,                           )
                                  )
        Respondent-Appellant.     )
                                            No. SD36035
    and

IN RE THE MATTER OF:              )
R.N.D. and S.F.D.                 )
                                  )
W.H.D.                            )
                                  )
        Petitioner-Respondent,    )
                                  )
    vs.                           )
                                  )
S.M.D.,                           )
                                  )
        Respondent-Appellant.     )

## DUBITANTE OPINION

Citing Mother's history of financial support, the trial court flatly rejected both charges of neglect, then looked to non-financial factors in granting one of two abandonment claims. Whether that "neglect-financial/abandonment-relational"

1

view was proper determines what evidence is relevant to our against-the-weight review.  A divided supreme court recently failed to settle that issue.[1]

If the trial court's rubric was proper, controlling principles of review dictate affirmance.[2]  On the other hand, if the court should have factored financial support into its abandonment analysis, we should reverse and remand so that court can do so.  It is far better suited and positioned for that task than we are.

DUBITANTE.

DANIEL E. SCOTT, J. – SEPARATE OPINION AUTHOR

---

[1] *See* **S.S.S. v. C.V.S.**, 529 S.W.3d 811 (Mo. banc 2017), which rejected against-the-weight challenges to abandonment and neglect findings reflecting a similar trial-court rubric (*see id*. at 815).  In doing so, the majority and dissenters discussed, but did not resolve, whether § 453.040(7) neglect has financial <u>and</u> non-financial aspects (the flip side of our issue as to § 453.040(7) abandonment).  *See id*. at 818; *id*. at 821 (Breckenridge, J. dissenting).

[2] I've not read a more thoughtful, sensitive, and considered judicial decision, trial or appellate.



# Missouri Court of Appeals
## Southern District
### en banc

In Re the Adoption of H.H.D. R.N.D.,  )
and S.F.D.                            )
                                      )
W.H.D. and S.G.D.,                    )
                                      )
    Petitioners-Respondents,          )
                                      )
vs.                                   )
                                      )
S.M.D.                                )
                                      )
    Respondent-Appellant.             )

and                                    No. SD36035

In re the Matter of R.N.D. and S.F.D.  )
                                       )
W.H.D.,                                )
                                       )
    Petitioner-Respondent,             )
                                       )
vs.                                    )
                                       )
S.M.D.,                                )
                                       )
    Respondent-Appellant.              )

### APPEAL FROM THE CIRCUIT COURT OF JASPER COUNTY

Honorable Joseph L. Hensley

DISSENTING OPINION

I respectfully dissent.

This is not a rare case.  Every day, all across our state, trial courts, especially in family

1

law cases, are called upon to hear evidence about hundreds or even thousands of events and interactions affecting or occurring between family members over the course of multi-year, sometimes decades-long, relationships. Many of these events involve the conduct of one, some, or all of the family members taken within the perceived privacy of the family unit where filters constraining public conduct are lowered or non-existent. Almost every event or action generates conflicting evidence drawn from at least two, and, depending upon family size, three, four, or more different perspectives both as to the actual conduct that occurred and the intent or motivation of the actor or actors engaging in that conduct. From the totality of the contested and conflicting evidence before it, the trial court is then called upon to ascertain the facts as to not only which events actually happened, but also as to the intent and motivation of the various actors in those events. In ascertaining those facts, the trial court must make innumerable credibility determinations related to that contested and conflicting evidence both as to each individual item of evidence and how each of those individual items contribute to the totality of the evidence giving rise to making a factual finding. These credibility determinations, however, are not necessarily limited to the binary task of determining whether a particular piece of evidence is true or false. Rather, more often than not, they implicate the third dimension of assigning relative weights to numerous discrete pieces of evidence in order to draw reasonable inferences from the evidence as to the existence of the ultimate elemental facts giving rise to the trial court's application of the law.

Here, Mother does not raise a substantial-evidence challenge to the trial court's factual finding that she intended to abandon R.N.D. during the requisite statutory period. Rather, in her sole point on appeal, Mother challenges that finding only as being against the weight of the evidence. In the absence of a substantial-evidence challenge, Mother concedes there was

sufficient evidence to support this finding. *See Ivie v. Smith*, 439 S.W.3d 189, 205–06 (Mo. banc 2014).

> Appellate courts act with caution in exercising the power to set aside a decree or judgment on the ground that it is against the weight of the evidence. . . . "[W]eight of the evidence" denotes an appellate test of how much persuasive value evidence has, not just whether sufficient evidence exists that tends to prove a necessary fact. . . . The against-the-weight-of-the-evidence standard serves only as a check on a circuit court's potential abuse of power in weighing the evidence, and an appellate court will reverse only in rare cases, when it has a firm belief that the decree or judgment is wrong.

*Id.* at 205–06 (internal citations omitted).

When reviewing an against-the-weight-of-the-evidence challenge, this court, nevertheless, defers to the trial court on credibility determinations "because the circuit court is in a better position to weigh the contested and conflicting evidence in the context of the whole case." *Id.* at 206. An "appellate court will not re-find facts based on credibility determinations through its own perspective. . . . This includes facts expressly found in the written judgment or necessarily deemed found in accordance with the result reached." *Id.* (internal citations omitted).

The factual determination of Mother's intent to abandon R.N.D. during the requisite statutory period was a contested issue in this case.[1] "When the facts relevant to an issue are contested, the reviewing court defers to the trial court's assessment of the evidence." *White v. Dir. of Revenue*, 321 S.W.3d 298, 308 (Mo. banc 2010). In its judgment, as related to this contested factual issue, the trial court found as follows:

> Following an incident in the home in September of 2015, [Mother] told [Father] to come and get [R.N.D.] because she was "out of control," and [Mother] could no longer handle her. . . .
>
> ****

---

[1] Abandonment, as relevant here, has long been recognized as the "intentional withholding by the parent of his or her care, love, protection and presence, without just cause or excuse." *G.S.M. v. T.H.B.*, 786 S.W.2d 898, 900 (Mo.App. 1990).

[Father and Step-Mother]] filed their petition for adoption on April 17th, 2018. They argue that counting back six months, [Mother] did nothing in the way of trying to see [R.N.D.] from October 17th, 2017 until April 17th, 2018, a period of six months. Further, they argue [Mother] did nothing for well over a year before that and an additional nine months *after* being served in the present case, and therefore her rights should be terminated based on abandonment.

The law is not so formulaic that abandonment can be determined simply with a calendar and a calculator. Abandonment is a question of the intent of the parent which is "discovered by examining all evidence of the parent's conduct, including the conduct before and after the statutory period." *In re B.L.B.*, 834 S.W.2d 795, 799 (Mo. App. E.D. 1992). Therefore a trial court is obliged to look to a biological parent's conduct both before and after a petition for termination of parental rights has been filed. *In re K.A.C.*, 246 S.W.3d 537, 546[13] (Mo. App. S.D. 2008). The intent to abandon, more often than not, is an inferred fact, determined by conduct not only within the statutory period, but also relevant conduct both before and after this period. *In re P.G.M.*, 149 S.W.3d 507, 514[11-12] (Mo. App. S.D. 2004). [Mother] testified at trial that she has not abandoned any of the children. However, it is essential to determine whether she abandoned [R.N.D.] . . . based on her conduct, judged by what she <u>did</u> rather than by what she <u>says</u>. *In re Adoption of K*, 417 S.W.2d 702, 705 (Mo. App. S.D. 1967). Otherwise put, her intention must be gathered from an objective consideration of her behavior as a course of conduct. *Id.* at 709.

[Mother]'s conduct *prior to* September of 2015 would favor a finding that she did not intend to abandon [R.N.D.]. As [Father] admitted, [Mother] exercised nearly all of her parenting time and contributed to [R.N.D.]'s care financially. But this conduct stands in stark contrast to her conduct *after* September of 2015. From that time period through January of 2019, [Mother] had no contact with [R.N.D.] other than sending a card or two through [S.F.D.] in September of 2016 and a Thanksgiving and Christmas card in 2018.

In fact, there was no in-person contact between [Mother] and [R.N.D.] for over <u>three years</u>. [Mother] had a chance encounter with [Father] and the girls in late November or early December of 2016 in the *Target* parking lot. The evidence conflicted on [R.N.D.]'s behavior that day, and whether [Mother] had contact with [R.N.D.] or only [S.F.D.], but either way, it is important to note this was a chance encounter. [Mother] had no idea [Father] and the girls were at *Target*. She was not actively seeking them out.

[Mother] defended her lack of effort by explaining she believed [Father] would have denied her contact with [S.F.D.] [and [H.H.D.]] if she pushed the issue of resuming visitation with [R.N.D.]. When questioned by the Guardian ad Litem as to why she waited until after March of 2018 to start specifically requesting visits, [Mother] stated she wanted to hire an attorney first and get legal advice, and could not afford to do so prior to March. These excuses are unconvincing. The Court has sympathy for single parents who, despite gainful employment, have difficulty affording legal counsel while paying child support. However, the simple things [Mother] needed to do to prevent a finding of abandonment of [R.N.D.] were things caring parents should not need professional

4

legal advice to figure out, but rather see to purely voluntarily out of love and concern for their child. Many parents denied access to their child go to extreme and Herculean efforts to see them and spend time with them. While [Mother] continued to try to maintain contact with [S.F.D.] and [H.H.D.] (discussed in more detail below), she put forth no effort at all regarding [R.N.D.], under the weak pretext of anticipated denial of visitation with the other children. But she did not *attempt* to see [R.N.D.] at school. She did not attempt to call or send text messages to [Father] to set up a visit with [R.N.D.] until March of 2018. She sent no birthday cards, letters[3] or gifts. There were no Christmas gifts from [Mother]. [Mother]'s excuses for not trying to see [R.N.D.] were therefore attributed to what she *thought* might happen if she tried to visit her. She may have been correct that her cards, letters, gifts, or phone calls would not have got through to [R.N.D.], or that [Father] would not have allowed her custodial time, but with regard to [R.N.D.], *she never tried.* She did not check in at [R.N.D.]'s school to see that she was attending. She did not talk to her teachers to see if she was succeeding or struggling or whether she could have lunch or spend time with [R.N.D.]. [Mother] did not check with [R.N.D.]'s doctor to ensure that she was healthy. Though [Mother] may have been afraid of the repercussions of reaching out to [Father] to see [R.N.D.], the Court questions what repercussions could have been worse than not seeing her child?

Perhaps more problematic is Mother's inaction *after* becoming aware of the Petition to terminate her parental rights and alleging abandonment. [Mother] was aware of the allegations of abandonment in this case no later than April 25th, 2018, when her attorney entered his appearance, but up through the date of trial she still had not seen [R.N.D.], nor checked on her at school or with her physicians, letting *another* nine months pass without seeing [R.N.D.] and with the shadow of the possible termination of her parental rights now looming. To be fair, after litigation commenced she requested [Father] allow therapeutic visits with all of the children, [R.N.D.] included. She also filed a motion to modify as well as a family access motion, but in truth, she did not need one to see [R.N.D.] at school or check in on her from time to time. Kelly Blackford, [R.N.D.]'s special education teacher at [her school], testified she had never seen [Mother]. In short, she did not do what one might expect a parent to do in her situation who does not intend to abandon her child.

The evidence is undisputed that [R.N.D.]'s autism is extreme, and the Court has taken her condition into account. [Mother] did not have the option of simply sending an e-mail or text message to [R.N.D.]. Visiting [R.N.D.] at school likewise *could* have been problematic, but it was not impossible. [Mother] testified that the worst thing you can do for a child with [R.N.D.]'s autism is avoid problem issues ("extinction") but rather deal with the problem behavior head on so that it does not prevent her from functioning in public where triggers such as food or new people are pervasive. But she did not exercise her own philosophy when it came to visitation with [R.N.D.]. It appeared she had her fill of [R.N.D.]'s behaviors in September of 2015 and never tried again. This was not a case where [Mother] lived hundreds of miles away from [R.N.D.] these two and half years. She literally lived minutes away in the same town. Nevertheless,

there was no evidence of any request to see [R.N.D.] until well into 2018. There was no evidence [Mother] had any idea who assisted with [R.N.D.]'s care, the names of her doctors and how she was doing physically, how she was doing at school, etc.

The Court will not belabor this point, as it will become more apparent when viewed in the contrast to [Mother]'s efforts to contact [H.H.D.] and [S.F.D.]. [Mother] simply made no effort to see [R.N.D.] or stay in touch with her. "Adults may set aside their books, hobbies, or other interests, and ignore them for months without consequence. Not so with their young children." *R.P.C. v. Wright County Juvenile Office*, 220 S.W.3d 390, 394 (Mo. App. 2007).

By word and by deed, she expressed an intent to abandon [R.N.D.] in September of 2015 and did not repent of that abandonment.

\*\*\*\*

[3] It is undisputed that [R.N.D.] could not read these cards, but that excuse is unavailing. First, [Mother] testified she did provide cards to [R.N.D.] through [S.F.D.] in September of 2016, until those visits at [S.N.D.'s school] stopped. Also, [Mother] resumed sending [R.N.D.] cards in 2018 for Thanksgiving and Christmas. The court noted in *In re H.M.*, 770 S.W.2d 442, 445 (E.D. 1989), "[the parent] attempts to excuse this failure on the ground that [the child] cannot read; however, we do not find this argument persuasive." The court reasoned "even small children appreciate hearing a parent's letter read to them by another adult." *Id.*

As the trial court noted in its judgment, citing **In re P.G.M.**, 149 S.W.3d 507, 514 (Mo.App. 2004), the intent to abandon, more often than not, is an inferred fact, determined by conduct not only within the statutory period, but also relevant conduct both before and after this period. "The greatest weight is given to conduct within the statutory period, and the least weight is given to conduct after the petition for adoption is filed." **I.D. v. B.C.D.**, 12 S.W.3d 375, 377 (Mo.App. S.D. 2000).

From the gratuitous factual findings in its judgment alone, without any consideration of additional evidence in the record favorable to the judgment, it is apparent that the trial court considered and weighed both its recited evidence supporting an inference that Mother intended to abandon R.N.D. during the requisite statutory period and the mitigating and contrary evidence Mother now urges on appeal supporting a contrary inference of her lack of such intent.[2] It is also

[2] "When reviewing the record in an against-the-weight-of-the-evidence challenge, this Court defers to the circuit court's findings of fact when the factual issues are contested and when the facts as found by the circuit court *depend*

6

apparent that, as part of that careful consideration and weighing process, the trial court applied its unique opportunity to observe each of the witnesses to the relevant events and to make credibility determinations as to their respective intents and motivations in engaging in such actions. The trial court assigned relative weights to each of those various facts, intents, and motivations and was *persuaded* based upon the totality of the evidence in the case that Mother intended to abandon R.N.D. during the relevant statutory period.

Could another trial court confronted with this same evidence draw a reasonable inference that Mother did not intend to abandon R.N.D.? Perhaps. However, "[w]hen the evidence poses two reasonable but different conclusions, appellate courts must defer to the circuit court's assessment of that evidence." *Ivie*, 439 S.W.3d at 206; *S.S.S. v. C.V.S.*, 529 S.W.3d 811, 816 (Mo. banc 2017). That is precisely what should be done here. As counseled by our Supreme Court in *Ivie*, this court should defer "to the circuit court's determinations that the [Respondents'] witnesses and evidence were persuasive and that [Mother's] witnesses and evidence were not. Therefore, the circuit court's judgment was not against the weight of the evidence." *Ivie,* 439 S.W.3d at 207.

The extensive and detailed 39-page judgment entered by the trial court here demonstrates that the trial court carefully, thoughtfully, and reasonably considered the mountain of conflicting and contested evidence before it, made credibility determinations in order to ascertain the relevant facts and assign relative weights to those facts, and then drew a reasonable inference

---

*on credibility determinations*. *Ivie*, 439 S.W.3d at 206 (emphasis added). Mother implicitly acknowledges the latter limitation upon her against-the-weight-of-the-evidence challenge by purporting to identify eight items of evidence as "[t]he contrary evidence in accordance with the trial court's credibility determinations[.]" However, Mother fails to explain or demonstrate in any manner, with citation to applicable supporting legal authority, how or why any of her purported items of contrary evidence are *not* dependent upon the trial court's credibility determinations. As with all other relevant evidence on the contested issue of Mother's intent, these eight items of evidence were all dependent upon the trial court's credibility determinations in making its assessment of the evidence. *See White*, 321 S.W.3d at 308 ("When the facts relevant to an issue are contested, the reviewing court defers to the trial court's assessment of the evidence.").

7

from those facts as to Mother's intent with regard to R.N.D. during the requisite statutory period. The trial court took the same deliberate, careful, and reasoned approach in considering the very different factual circumstances related to S.N.D. and its finding that Mother lacked the requisite intent to abandon her. These actions are the very essence of the proper exercise of the judicial power by a trial court to resolve highly contested, extremely difficult, and heart-wrenching family situations. This is not a rare case. Trial courts do this every day all across our state.

The trial court's judgment is not against the weight of the evidence and should be affirmed.[3]

GARY W. LYNCH, P.J. – DISSENTING OPINION AUTHOR

---

[3] In any event, Mother's against-the-weight-of-the-evidence claim on appeal should be denied in the first instance because it was not presented to the trial court and, therefore, was not preserved for appellate review. "[N]o allegations of error shall be considered in any civil appeal except such as have been presented to or expressly decided by the trial court." Section 512.160.1; *see* **Suffian v. Usher**, 19 S.W.3d 130, 135 n.14 (Mo. banc 2000) (section 512.160.1 prohibits appellate review of issue "never considered or ruled on" by trial court); **Horwitz v. Horwitz**, 16 S.W.3d 599, 602 (Mo.App. E.D. 2000) (citing section 512.160 to support holding that issue for which record fails to disclose evidence of an express ruling upon it by the trial court was not preserved for appellate review). "'An issue that was never presented to or decided by the trial court is not preserved for appellate review.'" **Brown v. Brown**, 423 S.W.3d 784, 788 (Mo. banc 2014) (quoting **State ex rel. Nixon v. Am. Tobacco Co., Inc.**, 34 S.W.3d 122, 129 (Mo. banc 2000)); **In Interest of B.L.L.S.**, 557 S.W.3d 486, 492–93 (Mo.App. S.D. 2018). As required by Rule 78.09, the trial court must be given the opportunity to rule on a question. **Brown**, 423 S.W.3d at 787. Adherence to this rule assists in resolving any alleged error at the earliest possible opportunity by "allowing the trial court to rule intelligently." *Id.* at 787–88. It is a critical component in the efficient and timely resolution of disputes and the conservation of the parties' and the courts' limited resources. *Id.* at 788.